THE STATE, BAIRD, prosecutor, appellant, and BAIRD and TORREY, respondents.*

1. When an issue is made by the pleadings and proofs on the question of the right to the permanent custody of infants, the case addresses itself to the general authority of equity as the public guardian of infants.

2. In such a proceeding it is not the technical right of either parent which will control the decision, but the primary motive of judicial action will be the well-being of the infants.

3. In the exercise of its legal discretion, the court in this case gave some of the children into the custody of each parent.

The opinion of the Chancellor is reported in 3 *C. E. Green* 195.

*Mr. Carpenter* and *Mr. Browning*, for appellant.

*Mr. F. B. Chetwood* and *Mr. Williamson*, for respondents.

The opinion of the court was delivered by

THE CHIEF JUSTICE.

This is a controversy between husband and wife, respecting the custody of their minor children. The proceeding was commenced by the medium of an habeas corpus in the Court of Chancery, and on the preliminary motion already made to dismiss this appeal, this court vindicated its right of jurisdiction in the present form over the subject matter of this suit.

In stating my views and the results to which I have come, it is not my intention to enter upon any discussion of the voluminous evidence which has been laid before the court. In dissensions of this nature, it is one of the worst

---

*This opinion was delivered at March Term, 1868, but did not come to the hands of the reporter till too late for publication with the opinions of that term.

features that the door of the private household must be thrown rudely open, and its most sacred recesses exposed to the public gaze. It is a relief, therefore, to feel that duty will permit the veil to be re-drawn.

An epitome of the facts of the case is given in the opinion sent up from the Court of Chancery, but I do not think it necessary for me to recapitulate even that general summary. To the Chancellor's conclusions upon the matters of fact, in the main, if not altogether, I assent. Of these there are three which are the principal ones, and upon which the ultimate decision of the case, with regard to the rights of the parties, must rest. First, the Chancellor holds that Mrs. Baird was not justified in the desertion of her husband. To this I entirely agree. The act was one which, in the eyes of every legal tribunal, must be regarded as a manifest violation of morals and of law. The distempered state of the respondent's mind from sickness, and her subjection to advice which, though meant as kindness, was cruel injury, may indeed, in some measure, serve to palliate, but must prove greatly insufficient to vindicate her conduct. In this important particular the wife was conspicuously in the wrong. And yet, notwithstanding this belief, I further agree with the Chancellor, that judging from the testimony as a whole, it is clear that the respondent would be a trustworthy guardian of her children. Upon this subject I have not the least doubt. In that part of her conduct already referred to, I have said she greatly erred, but that act, regarded as an infringement of the moral code, stands single, as I am willing to believe, in the history of her married life. I absolve her altogether, in my own mind, from the other accusation brought against her, although I think her husband, under the circumstances, was naturally and perhaps inevitably led to a belief in her guilt. Throughout the general tenor of the testimony I discover many indications that the respondent is a woman of amiable disposition and moral worth. It seems to me much to the credit of her husband that this is the estimation in which he held her,

even after their unfortunate 'final separation. I have no doubt that these children if left with the respondent, would, in the course of their training, be surrounded by every proper maternal influence.

And again, in the third place, my conclusion entirely harmonizes with that of the Chancellor in this respect, *viz.* that the vindication of the character of the appellant, Mr. Baird, is by the evidence completely triumphant. I refer to his character both as a man and as a minister of the Gospel. As to the charges against him of the commission of positive crime, they are so entirely overcome and exploded by the testimony, as to leave neither doubt of his innocence, nor of the indiscretion of those who made the accusation. No candid person can examine this evidence and not be satisfied that there is not the smallest ground for a suspicion that Mr. Baird is not innocent of all and every part of the impure conduct so rashly imputed to him. I believe it is the opinion of every member of this court that he is entitled to come out of this trial without a stain upon him, as a man of morals and as a Christian minister. His character, in its varied phases of public and domestic life, has been laid open to the severest scrutiny; his letters, evidently written in moments of unreserve and in the candor of an unsuspicious affection, have revealed, not only his professional career with its attendant views, aims, and sentiments, but also the minute details of his feelings, thoughts, and conduct as a husband and father; nothing has been kept back; the developement is perfect; and I think from this entire disclosure the fair result is, that after bating the usual quantum for human infirmity, we have presented to us a man imbued and guided by the purest religious inspirations, and actuated on all occasions by unselfish domestic affection. Much censure was cast on this appellant, on the argument, on the score of his disposition to embroil himself on mere punctilios with his congregations. It would be singular if in these years of arduous life, nothing could be found which would afford a subject for stricture or regret;

but I think it is clear that he must be a blind censor indeed, who could fail to perceive that the same tract of time presents ample materials for praise and admiration. As a signal example of the truth of this last observation, I need only refer to the letter written by Mr. Baird to his wife after she had clandestinely withdrawn her children from his house. In that affair it is impossible not to feel that the appellant was cruelly wronged and outraged, and yet the letter to which I refer is not only silent as to those wrongs, but runs over with affection, and appeals to the wife, on the ground of all things sacred by laws human and divine, to return to the post of duty by his side. In my estimation, that letter could have been written only by the hand of a Christian gentleman.

Upon these conclusions, then, that both Mr. and Mrs. Baird are proper custodians of these children, and that they were unlawfully abstracted from their home by their mother, the question arises as to their proper disposition upon the ground of legal principles. In arranging this legal result the Chancellor appears to have been embarrassed by the form of the proceedings; he declared that the legal right to all the children, except such as were under the age of seven years, was in the husband, but that on a proceeding by habeas corpus he had not the power to award them to him. He felt himself at liberty, however, to establish permanently the position of the children, placing them in the custody of the mother, and permitting the father to visit them on condition that he should not use such privilege to deprive the mother of their custody either by persuasion or force. There is so much confusion in the books, and conflict of judicial sentiment respecting the authority which may be exercised by virtue of this kind of writ, that it is not to be wondered at that there should be perplexity in the practical application of the doctrine, but in the progress of this cause it has been already decided that in the opinion of this tribunal the present case came before the Court of Chancery in such a guise as to appeal to

its general jurisdiction over the interests of infants. It is upon this principle, therefore, that the case must be determined. Both the parties to this litigation have called upon the Court of Chancery to provide for the permanent custody of these infants, and such custody must be adjudged in accordance with those considerations upon which a court of equity acts in discharge of its responsible duty as the public guardian of minors.

As a matter of strict law, it cannot be denied that in this state, as at common law, the general rule is, that the claim of the father to the persons of his infant children, is paramount to those of the mother. This rule is so entirely axiomatic that it would be idle to cite authorities in its support. But this rule has only a subordinate application whenever a court of equity is called upon to exercise its authority in that branch of its capacity just referred to. On such an occasion it is not the dry, technical right of the father, but the welfare of the child, which will form the substantial basis of judgment. The legal right of the father will not be passed by, except when, in the opinion of the court, the well-being of the child requires such supersedure. The application under such circumstances is, obviously, an appeal to the discretion of the court; a discretion, which of course is, as far as practicable, to be regulated by settled rules and admitted principles. In the exercise of such a function the circumstances of each case must, of necessity, become important elements entering into the grounds of decision. The character of the respective parents, the age, health, sex, and number of the children, and the pecuniary resources liable to contribution for their maintenance and education, are all considerations which should and must exert more or less influence over the judicial result. In the present case, the duty of arbitrating thus between the claims of these rival parents, in view of the best interests of the children, is felt to be one of painful responsibility. In common with every member of this court, I have felt oppressed with the weight and delicacy of the office, and now, my greatest

satisfaction is, the consciousness that if I have erred in my conclusions, such error has not occurred, at least, from want of a careful consideration of the subject. The judgment which I have formed is this : that the eldest child, the daughter, who is now nearly of age, should remain in the care of the mother, if she so desire ; that the same disposition should, for the present, be made of the two youngest children; and that the remaining three children should be delivered over to their father. Provision should be made in the decree for the reasonable access of the parents, respectively, to the children, and a privilege should likewise be reserved, that either party, in case of any material change of circumstances, should be permitted to come into court for further directions or assistance.

In forming these conclusions I have been influenced by a variety of considerations, among which are the following : that the custody of the youngest child belongs to the mother by force of the statute ; that the second is still of an age greatly requiring maternal superintendence and care, and can, as yet, be best trained in company with his younger brother ; that the pecuniary means of the father, as shown by the evidence, seem now to be somewhat narrow and precarious, and that these children now are, and have been, well provided for ; and that the eldest child is now so near her majority, that to compel her, against her will, to abandon her present home and course of education, and submit to a new and transient control, could not fail to prove highly prejudicial.

The decree should be reversed, and a new one entered conforming to the views above expressed.


ELMER, J.

I concur in the views expressed by the Chancellor and the Chief Justice, in regard to the facts of this case. The result in my opinion is, that the father is entitled to the possession and control of his children over the age of seven

years, except that considering the age and sex of the eldest daughter, I think she should be permitted to choose with whom she will reside.

As the appellant, when he was deprived of his children, was, and still is domiciled in the city of Philadelphia, I do not think that our statutes necessarily apply to this case. If he had sought only, by means of a habeas corpus, to free his children from illegal restraint, he would have been entitled to such action by the Chancellor or a judge, and should have been protected in taking them to the place from whence they came, leaving their future disposition to be settled by the tribunals of that place. But he has appealed to the special power of the Court of Chancery of this state to regulate the condition of infants, and put his case on our laws. Under these circumstances, I concur in the decisions, that the youngest child shall for the present continue with the mother; and although I do not dissent from the decree ordered by the majority of the court, directing that the next oldest boy remain with her for the present, I think it right to say that I should have been better satisfied if he also had been committed to the custody of his father.

DALRIMPLE, J., dissenting.

The prosecutor was married to Adeline T. Baird, on the 20th day of September, in the year 1849, at Princeton, in this state. There are now living six children, the issue of this marriage. The oldest is a daughter, in the 17th year of her age. The others are sons, aged respectively 14, 12, 10, 8, and 5 years. The prosecutor and his wife lived and cohabited together from the time of their marriage till the 11th day of March, in the year 1862, when the wife abandoned the home of her husband in the city of Philadelphia, took with her the five oldest children, and afterwards located herself with them in this state, under the protection of her father. The sixth child was born within a few months after the desertion. The wife and children have

continued to reside in this state, and the husband in Philadelphia, ever since the separation.

On the 18th of June, 1864, more than two years after the separation, the prosecutor filed in the Court of Common Pleas, of the city and county of Philadelphia, a libel for divorce from his wife, notice of which was duly served on her, and such proceedings were thereupon afterwards had, that a decree of divorce was made dissolving the marriage contract between the parties, on the ground that the wife had willfully and maliciously deserted her husband, and absented herself from his habitation without reasonable cause, and had persisted in, and continued such desertion for the term of two years and upwards.

On the 12th day of April, 1864, two years, one month, and one day after the prosecutor had been deprived of the custody of his children, he sued out of the Court of Chancery of this state, a writ of habeas corpus against his wife and her father, commanding them to produce the bodies of the said children, together with the day and cause of their being taken and detained. The father of Mrs. Baird made return to the writ, that the children were not detained in his custody, but that they were in the custody, charge, and care, and under the control and direction of their mother, and were living with her in Manchester, in the county of Ocean, in this state, in a dwelling-house occupied by the mother and children, and in which the mother was at housekeeping by herself with her said children. This return has not been traversed. The defendant, by whom it was made, is therefore out of the controversy. Mrs. Baird, by her return, admits the custody of the children, and produces them in obedience to the writ, and alleges two causes for their detention. The first is, that they are her children, and are of a tender and helpless age, and require the nurture and care of a mother; second, that their father has not the means of maintaining and educating them, and had not made the necessary provision for maintaining his wife and children for a large portion of his married life. For the purpose of

The State, Baird, pros., *v.* Baird and Torrey.

supporting the latter allegation, she gives a connected history of the labors of the prosecutor in his profession, which is that of a clergyman, shows that he met with ill-success in every charge over which he was placed, and therefore, she says he was not, by means of his profession, able to support his family.  The reasons for her separating herself from her husband she alleges are, his long and continued ill-treatment of, and cruelty and personal violence to her, and his immorality and impurity of character.  Under the general charge of immorality, she, among other things, charges the prosecutor with frequenting houses of ill-fame, and consorting with lewd women, and that he behaved in an immodest, indecent, and unbecoming manner towards the female servants of his family.  The prosecutor responds and says, that his children are no more helpless, and that they no more require the nurture and care of their mother than ordinary children of like ages, and denies the charges of inability to support his family, of immorality and impurity of character, and of cruelty to and ill-treatment of his wife.

Upon the issue thus formed a mass of evidence has been taken, most of which, in my opinion, throws no light whatever upon the real questions to be determined.  It will be perceived that the point to be decided is, not whether the children are illegally restrained of their liberty, but the issue is so framed as to compel the court to decide whether, under the circumstances of this case, the father or mother of these children is entitled to their custody.  The father contends that the law gives him the custody of his children; the mother sets up a counter claim; and the court must settle whether the right of the father or mother is paramount.  That was the question which the learned Chancellor met and decided.  The decree from which the prosecutor appeals is, that the custody of all the children of the prosecutor and his wife is awarded to their mother, that the children are to be at liberty to remain with their mother, and the father must be allowed to visit his children at proper times, and under proper limitations, on the condition

that he shall not use these visits to deprive their mother of the custody of the children, either by persuasion or force.

By the common law, the father is entitled to the custody of all his minor children. That is the rule in this state, except so far forth as it has been altered by the act of March 20th, 1860, and the supplement thereto, of March 15th, 1861. *Nix. Dig.* 391. By force of the acts referred to, if husband and wife live in a state of separation, whether divorced or not, on habeas corpus the wife shall, if not an improper guardian, be entitled to the custody of the children within the age of seven years, until they shall attain that age, unless there is a decree of divorce separating husband and wife, which provides for the custody and disposition of their minor children. The statutes, in effect, declare that the common law shall remain in force, except as to children under seven years of age. It is not necessary to cite authorities in support of a rule so long and well settled. The law of nature and society concur in giving to the father the custody of his minor children. In the case of *Foster* v. *Alston*, 6 *Howard (Miss.) Rep.* 406, Chief Justice Sharkey, in a dissenting opinion, says: "We are informed by the first elementary books we read, that the authority of the father is superior to that of the mother. It is the doctrine of all civilized nations. It is according to the revealed law, and the law of nature, and it prevails even with the wandering savage, who has received none of the lights of civilization. The father is considered the head and governor of the family." In the case of *The People* v. *Mercein*, 3 *Hill* 422, Justice Bronson says: "It may be best that the wife should be declared head of the family, and that she should be at liberty to desert her husband at pleasure, and take the children of the marriage with her. But I will not inquire what the law ought to be; that prerogative belongs to others. I will however venture the remark, even at the hazard of being thought out of fashion, that human laws cannot be very far out of the way when they are in accordance with the law of God." Justice Elmer, in his charge to

the jury in the case of *Magee* v. *Holland,* 3 *Dutcher* 88, says : " By the law of the land, a father, unless deprived of it by appropriate legal proceedings, has a right against all the world to the services and the company of his legitimate children; and no one, not even his wife, the mother of the children, has a right to deprive him of it. It is the duty of the wife to live with, and to take care of their children."

But there are exceptions to this rule, which are as well established as the rule itself. If the child be of tender years, requiring the nurture and care of the mother, or if the father for any reason be, in the opinion of the court, an unfit custodian of his children, they may be taken from him and their custody awarded to their mother. The welfare of the children is to be regarded, and the court, in its discretion, is to see to it that they are placed in the custody of the father or mother, as may be most for their good. The discretion which the court is to exercise in regard to the custody of minor children, is not an arbitrary discretion, which has been well said to be the law of tyrants, but a judicial discretion, governed in each case by fixed rules and principles. In the well considered opinion of Chief Justice Sharkey, from which I have already quoted, he holds the following language, which appears to me to state correctly the law upon this subject : " The court may exercise a discretion for the benefit of the child and place it where its interests would be best promoted. But this must be determined by a judicial discretion, not captious, or unrestrained, or arbitrary. And this discretion can only be exercised on a sufficient showing. But if, on the other hand, the father or guardian be a suitable person to have the child, then there is no discretion with the court. The court must, in such cases, regard the legal right. They are as much bound by it as by the law on any other subject. A different rule is destructive of the law; for if the court in all cases may award the child to whom it pleases, this would make the will of the court the law. It is in vain that the law has given the father the right to the custody of his child, and

has also given him power to appoint a guardian, if a court or judge, on habeas corpus may, of a mere arbitrary will, defeat these laws. This is the doctrine of all the well adjudged cases which have been cited; it is the dictate of reason. Nor does the law deprive the father of the right on slight grounds; there must be an *obvious* reason for preferring the mother, otherwise there is no room for the exercise of discretion." The prosecutor is therefore entitled to the custody of his children, unless their good requires that they should remain with the mother. What, if any, facts or circumstances appear in this case which will justify the court in awarding the custody of these children, or any of them, to the mother? What reasons does she assign for taking and detaining the children from their father, who is their natural and legal guardian? It is said, in the first place, that they are of a tender and helpless age, and require the nurture and care of a mother. No evidence has been taken to show, and it was not insisted on by counsel of defendant on the argument, that the children, or any of them, are sickly or of feeble constitution. They no more require the care and nurture of the mother than ordinarily healthy children of the same age. The bare allegation unsupported by proof, that they require the care and nurture of the mother, will not suffice to take the case out of the general rule. The next allegation is, that while Mrs. Baird lived with her husband, he did not sufficiently provide for his family, and has not now the means of supporting and educating his children. The prosecutor and his wife were, at the time of their marriage, without property, and had nothing on which to depend, save the personal exertions of the husband. I think the evidence clearly shows that he is possessed of talents and learning, by which he may earn a comfortable support for himself and children, and that the decided weight of the evidence is, that though never in affluent circumstances, yet he always provided his family a decent and comfortable support. It may be that his ill-success in his profession is fairly attributable, to some extent

at least, to his many and oft repeated domestic troubles, for some of which he may not be alone to blame. I have no fear that these children, if given to the father, will suffer for the want of the common comforts and necessaries of life, nor that their education, mental or moral, will be neglected. On the other hand, we must consider that the mother has no property, but is wholly maintained by the bounty of another. It is next urged that the prosecutor is of such immoral character and vicious habits, as to render him an unfit person to have the care and training of minor children. Without going into an examination of all the evidence applicable to this branch of the case, I shall content myself with simply saying what I conceive to be due to the cause of truth and justice, and that is, that the charges of profligacy and immorality, alleged by the wife against the husband, are unfounded, unsupported by any satisfactory evidence, and most completely disproved. In respect to the falsity of these charges, I do not think there can be or is but one opinion. There is not, then, anything in the circumstances, life, or character of the father, which should deprive him of the comfort, society, care, and education of his children. Through all his married life he seems to have done all in his power to promote the welfare and happiness of his wife and children. In my opinion, it would be the exercise not of a judicial, but an arbitrary discretion, to transfer the custody of these children, or any of them, from the father, where the law has placed it, and give it to the mother. In the case of *The Commonwealth* v. *Briggs*, 16 *Pick.* 205, Chief Justice Shaw says: "The court will feel bound to restore the custody where the law has placed it, with the father, unless in a clear and strong case of unfitness on his part to have such custody. The unauthorized separation of the wife from her husband without any apparent justifiable cause, is a strong reason why the child should not be restored to her."

It appears by a decree of a court having jurisdiction of the parties and the subject matter, that the desertion of the

prosecutor by his wife was without any reasonable cause, but was willful and malicious. In the divorce suit in Philadelphia she was served with process, had full opportunity to appear and make defence, and I believe did appear, but the decree was against her. But aside from the decree, I do not think the reasons assigned by the wife for her abandonment of the home of her husband, are supported by the evidence. I have already disposed of the charges of immorality. Those of ill treatment of and cruelty to herself are not proved. True, she testifies to acts of personal violence which, if satisfactorily proved, might perhaps justify the separation of the wife from her husband; but I agree with the Chancellor in the belief that the feelings of hostility entertained by the wife towards her husband, have led her unconsciously to magnify the veriest trifles into acts of brutality and heartless cruelty. The prosecutor denies these charges of violence to the person of his wife, and details at length the occurrences out of which they took their rise. His story bears the impress of truth. I cannot believe, from the evidence before me, that Mrs. Baird left the home of her husband because her personal safety required it, nor because of any personal violence threatened or committed. It is alleged that her husband, shortly before the separation, charged her with an attempt to produce an abortion upon her own person. It is said on the one hand that the charge was without foundation, and was cruel, and showed a wanton disregard by the husband of the feelings of his wife. On the other hand it is affirmed that the real reason why the wife left her husband was because he had detected her in this attempted abortion. Without going into any discussion of the truth or falsity of the charge, I may say that I think no one can shut his eyes to the fact that the evidence upon which the prosecutor acted in making the charge fully warranted him in making it, and the circumstances were such as to call upon him to make a full, thorough, and searching examination of the nature and character of the medical treatment to which his wife, without his knowledge

or consent, had been subjected.  I am satisfied that in all his conduct in this regard he was actuated by the purest and best motives, and had he, under the circumstances, done less than he did, he would have become, morally at least, a *particeps criminis.*  As a husband and father he was called upon to assert his authority to prevent what appeared to him to be an attempt to perpetrate in his house a crime of a most heinous character.  He was awake to his duty, and performed it in a manner neither indiscreet nor unkind. His conduct in that matter, so far from going to show his unfitness for the care and education of his children, or his cruelty to or ill treatment of his wife, impresses me with the belief that he is a man of kind heart, good morals, and correct principles.  Mrs. Baird has denied the charge on oath, and in that denial is supported by the physician who attended her at the time the alleged abortion was attempted. It is not now necessary to settle on which side lies the weight of evidence.  I entirely agree with the Chancellor that the evidence on which the prosecutor acted, even with the contradiction of the charge before us (which he had not), would not, in a court of law, be deemed insufficient to support a verdict.

The conclusion to which I am forced is, that the decree of divorce in Pennsylvania is founded in fact, and that the wife had no reasonable cause for her desertion of her husband. For two years and upwards she lived in a state of separation unauthorized by law, though in the meantime her husband addressed to her the most touching letters that husband could write to wife, imploring her for her own sake, for his, and that of their innocent children, to return to the post of duty and honor.  To these appeals she turned a deaf ear, and refused even to see the writer, though he had assured her that his arms were wide open to receive her, and that he was willing to forget and forgive.  The prosecutor, after waiting over two years, commenced these proceedings.  They in no wise alter the wife's course of conduct; she puts in a return to the writ, which shows that

her feelings are hostile to her husband, and that she cannot do him common justice; then follow the proceedings for divorce. From the hour when the wife deserted her husband, and clandestinely took away the children without the knowledge or consent of their father, she has not for a moment relented, but has been determined to remain separate from her husband, and retain control of the children. I cannot under such circumstances, though she may be a kind and devoted mother, commit to her custody and training these children. To do so would be to expose them to influences inimical to their father, and the result would be, that when they arrive at years of discretion their affections would be alienated from him, and they would not entertain for him the reverence or respect due from a child to its parent. If in the end the mother shall succeed, and the rights of the father be disregarded, the example can only work evil. Admitting, as I cheerfully do, that both parents seek the best good of the children, I believe that when the excitement of the present controversy shall have passed away, the mother herself will admit that the proper place for the children is with the father, whom the law has designated as their guardian and protector.

Nor do I see upon what principle we can make a division of this group of children, between the father and mother. Are one-half to be given to the father, and the other half to the mother? True, the mother has succeeded in disregard of the rights of the father, in withdrawing the children from a foreign jurisdiction where they belong, to this state. Has she thereby acquired any rights? Why should the daughter be given to the mother? Because she is a daughter? Is there any principle of law by which the right of the father to the services and society of his daughter, is any less sacred than it is in case of a son? Suppose the daughter were the only child, would she, under the circumstances of this case, be given to the mother? Are the rights of the father in respect to that child in anywise impaired, because he has other children? I have failed to discern any reason

for giving any of these children to the mother, which does not apply with equal force to all. It will be best for them to be kept together, and brought up under the same influences. Rather than separate them I would give them all to the mother. If the father is fit and competent to have the custody of his children, I cannot see upon what principle we can take any of them away from him. I do not think the statutes referred to apply to a case like this. It must be recollected that the wife has, in fraud of the rights of the husband, withdrawn herself and children from a foreign jurisdiction. Her legal residence up to the time of the divorce at least, was, and that of the children yet is, in a neighboring state. I do not think she can invoke the aid of our statutes and claim the possession of the children under seven years of age. To allow her to do so would be to allow her to take advantage of her own wrong. The statutes were designed for no such case. Can it be that the wife, by a fraudulent withdrawal of her children from Philadelphia to this state, contrary to law, can acquire rights which would not have been accorded to her if she had remained at the place of her residence? I think not. Nevertheless the prosecutor in his petition for the habeas corpus, only claims the custody of the children above seven years of age, and concedes the right of the mother to those under seven, and as the case has been litigated with the understanding on both sides that the statutes applied to it, I am not therefore now willing to make a case for the prosecutor which he has not made for himself, nor to make his claim broader than he himself has made it. To do so might lead to injustice. Nor do I think in a case like this, the court should be controlled by the wishes of the children. They were attached to their father, and he to them, when they were taken from him. It may be that after the lapse of six years their affections have been alienated from their father. If so, he should have the opportunity to win back their lost affections, and train them up to love, reverence, and respect him.

The result to which I have come is, that the decree of the Chancellor should be reversed, and a decree made that the prosecutor have delivered to him all the children except the youngest, and that that one remain with the mother until it shall attain the age of seven years; each parent to be allowed to visit the children at all proper times; neither, however, to take advantage of such visits to interfere with the custody of the children, as decreed by this court.

The decree was reversed by the following vote:

*For reversal*—BEASLEY, C. J., BEDLE, CLEMENT, DALRIMPLE, DEPUE, ELMER, KENNEDY, OGDEN, VAIL, WALES, WOODHULL. 11.

*For affirmance*—VREDENBURGH.