545 So.2d 1378 (1989)
Debbie A. KANTOR, a/K/a Debbie A. Drecksel, Appellant,
v.
George S. KANTOR, Appellee.
No. 87-2478.
District Court of Appeal of Florida, Fourth District.
June 28, 1989.
Jane Kreusler-Walsh and Larry Klein of Klein, Beranek & Walsh, P.A., and Ronald Sales, West Palm Beach, for appellant.
Edna L. Caruso of Edna L. Caruso, P.A., West Palm Beach, and Slawson & Burman, North Palm Beach, for appellee.
PER CURIAM.
AFFIRMED.
GUNTHER, J., concurs.
GLICKSTEIN, J., concurs specially with opinion.
ROBINSON, STEVEN D., Associate Judge, concurs specially with opinion.
GLICKSTEIN, Judge, concurring specially.
The trial court's final judgment recites, in part:
1. Although there are a number of issues to be resolved by the Court, the focal point of this proceeding is the welfare and future of the parties' minor child, Konrad, born April 30, 1985 in West Palm Beach Florida, A copy of Wife's Exhibit 2 (a photograph of Konrad) is attached to this Final Judgment.
2.A. This is a proceeding for dissolution of marriage between Debbie A. Kantor a/k/a Debbie A. Drecksel, born November 20, 1955 and George S. Kantor, born March 8, 1949. The Wife is the youngest of six children born and raised in Salt Lake City, Utah and is a devote Mormon. She has a high school education and training as a keypunch operator together with one and a half years of attendance at the University of Utah. She has also been a part-time physical therapist. All of her family, including her parents and her siblings, still reside in Salt Lake City, the Wife having been the only one to have left town, first to California and then to Florida. She has probably been an anomaly in her family in that among other things, she and the Husband lived together, out of-wedlock, for three years prior to their marriage on May 20, 1984 in Key West, Florida, (the marriage appears to have been a spontaneous occurrence without much, if any, prior planning). The parties met while the Husband was a medical intern at a hospital in Salt Lake City and from there they moved to California for a period of time before moving to Palm Beach, Florida. The Wife has in the past done professional modeling and has been in at least three television commercials for such products as Pepsi and Wranglers. The Husband is a reconstructive orthopedic surgeon. He is an only child whose father is a retired Rochester, New York police officer. Konrad is the only grandchild of the Husband's parents. The Husband and his parents have lived off and on for sixteen years here in Florida and New York. The Husband began his orthopedic practice in Palm Beach County several years ago after moving from Los Angeles, California. The wife joined him several months after he had moved to Florida.
2.B In addition to his orthopedic reconstructive surgery practice, the Husband, not surprisingly, is an accomplished carpenter and as a sideline has for a number of years purchased "handyman special" homes and with his own efforts has remodeled same and thereafter sold same for a profit. This side activity, which has been ongoing long prior to the parties' marriage, has at present culminated in the purchase by the Husband and reconstruction of the present marital residence. In addition to the Husband's direct investment of money and labor, a twenty-five thousand dollar loan was obtained from the Husband's *1379 parents which also went into the purchase of the marital residence. These matters, coupled with a conveyance by the Husband to the Wife by Quit-Claim Deed of the marital residence in November of 1985 (Husband's Exhibit No. 11), will be considered later in the Final Judgment.
... .
10. A substantial amount of testimony and evidence has been presented during the course of the trial regarding the Wife's career opportunities in professional modeling here in Florida versus California. The professionals who have testified in the case indicate that New York and Los Angeles are the primary business centers for professional models. There was adduced testimony however, that while not in the same league as New York and California, Florida does have in the Palm Beach to Miami area a substantial modeling demand. As with everything else in life, timing is a factor. Timing addresses itself not only to the age limitations of the Wife's activities in modeling but also to the recent sales tax enactment by the Florida Legislature. Testimony was adduced during the trial that the sales tax impact on advertising sending advertisers out of the State of Florida will adversely impact on the Wife's abilities to pursue a financially rewarding career in modeling in the State of Florida. If Konrad had not blessed these parties, the decisions in this case would be rather simple, i.e., a dissolution could be granted and the Wife could go to California to pursue her career in modeling and the Husband could remain here in Florida and pursue his orthopedic practice. With the advent of Konrad, the geographical locations of the parties becomes important not just from the standpoint of their careers but also as it relates to the logistics of Konrad sharing time and life's experience with both of his parents. It is clear to the Court that the law should not and does not in this day of rapid transportation and communications limit parties to the geographic areas of their endeavors. The Court does not have the lawful authority nor should it have the lawful authority to require any particular individual, husband or wife, to live in one place as opposed to any other place. The Court also recognizes however, that the location of a minor might well impact upon the geographic location of the minor's parents.
12.[Sic] Returning now to the focal point of this "dissolution proceeding", the Court has received reports in evidence and testimony as it relates to Konrad and Konrad's future. The Court has struggled with the divergent views of the professionals who have testified in this case as well as the recommendation of the Guardian and the desires of the mother and father of Konrad. Succinctly put, the Guardian ad litem and the Wife's experts espoused the "tender years" doctrine and therefore recommend to the Court and urge that Konrad should be in the primary residence of his mother; that the residence should be in Los Angeles, California and that the father should be allowed to send video tapes of himself to Konrad, make regular telephone calls to Konrad and visit transcontinentally with Konrad whenever the father wishes to do so. The Wife's position is that if she were required to remain here in Florida and thereby be unable to pursue her career in modeling in California that she would be unhappy and this would adversely affect Konrad. The mother further opposes even overnight visitations with the father at this time based upon the professional testimony to the effect that Konrad is frightened when he has to go to bed in a different bed other than the one that he has at the residence with his mother. In juxtaposition to the Wife's experts, the Husband's experts and Doctor Alexander who was appointed by the Court to study the mother and the father, strongly recommend and urge to the Court that weekly ongoing physical contact between Konrad and his mother as well as his father is necessary in order to establish "bonding" between Konrad and his parents. The Husband's experts strongly believe that the necessary bonding in *1380 Konrad's best interest could not be accomplished transcontinentally. After much deliberation and evaluation of the testimony of the experts as well as the other witnesses who have testified to the relationship between Konrad and his father and Konrad and his mother and placing Konrad's best interest as the top priority in this case, the Court determines that it is necessary and required in Konrad's best interest that Konrad have regular weekly physical contact with both his mother and his father. With that determination being the guiding force and direction in this case, the Court will address the other issues.
14.[Sic] Although this is titled a Final Judgment, the only "final" resolutions are those that relate to the actual dissolution and the property divisions. The determinations relating to Konrad insofar as support, residency and shared parental responsibility are, absent some further agreement between the parties, to be reviewed on an annual basis to determine by Konrad's progress the appropriateness of the Court's determinations.
15. Inasmuch as the parties agreed to establish their family here in Florida and inasmuch as it is the mother who finds the need to move cross-country to pursue her career, and inasmuch as the Court has determined that it is in Konrad's best interest to have regular weekly contact with both parents, the Court will determine by this judgment that for the ensuing year Konrad's residence will be herein Florida. The parties have agreed that the Wife should be the primary residential parent and have agreed to a present visitation schedule. Even though the Court will determine a special equity in the Husband in the marital home place until the home place is sold, the Wife shall be granted along with Konrad the exclusive use and occupancy of said residence. Should the Wife in furtherance of her professional career find it necessary to go to California or New York, arrangements will be made for the Husband to become the primary residential parent during the Wife's sojourn whether the period of time involved be more than five days to a permanent move. It is the specific determination of the Court that for the ensuing year any cross country traveling will be done by the Wife and not by Konrad nor the Husband. This decision is not intended to be an imprisonment of the Wife here in Florida but is rather specifically designed to allow the Wife to leave Florida to pursue her career and to allow Konrad to maintain physical contact with her as well as allowing Konrad to maintain physical contact with his father."
The decision of the New Jersey Supreme Court in Cooper v. Cooper, 99 N.J. 42, 491 A.2d 606 (1984), to which the majority did not refer in their recent decision here in DeCamp v. Hein, 541 So.2d 708 (Fla. 4th DCA 1989), is important because this state's highest court will set Florida's policy as Cooper did for New Jersey. In that regard, Cooper recognized Judge Pressler's decision in D'Onofrio v. D'Onofrio, 144 N.J. Super. 200, 365 A.2d 27, aff'd, 144 N.J. Super. 352, 365 A.2d 716 (1976), as the leading case in the area; and I predict our supreme court will do likewise. It is creative and, as described by New Jersey's highest court, thoughtful.
Notwithstanding the old saw about the Hand cousins on the Second Circuit Court of Appeals  you quote Learned but follow Augustus  Cooper recognized that there is so much in D'Onofrio to quote and follow, it did so, for other states to follow, as this court has done in DeCamp.
The New Jersey legislature had the wisdom, as early as 1902, to realize the importance of both parents to a child when it enacted L. 1902, Ch. 92, § 7. The current version, N.J. Stat. Ann. 9:2-2, provides:
When the Superior Court has jurisdiction over the custody and maintenance of the minor children of parents divorced, separated or living separate, and such children are natives of this State, or have resided five years within its limits, they shall not be removed out of its jurisdiction against their own consent, if of suitable age to signify the same, nor while under that age without the consent of *1381 both parents, unless the court, upon cause shown, shall otherwise order. The court, upon application of any person in behalf of such minors, may require such security and issue such writs and processes as shall be deemed proper to effect the purposes of this section.
Florida's shared parental responsibility law was enacted eighty years later, to effect the same support  emotionally and financially  for children. Cooper discussed the current version of the statute as well as similar statutes of other states and the interpretations given them, which I shall not repeat here. It posed the question before it as follows:
The statutory language affirms that the purpose of the statute is to preserve the rights of the noncustodial parent and the child to maintain and develop their familial relationship. This mutual right of the child and the noncustodial parent to develop and maintain their familial relationship is usually achieved by means of visitation between them. Because the removal of the child from the state may seriously affect the visitation rights of the noncustodial parent, the statute requires the custodial parent to show cause why the move should be permitted. Because the legislation and the cases are silent as to what kind of and how much cause must be shown, we must decide that issue today.
491 A.2d at 610.
The court then held:
When removal is challenged under N.J.S.A. 9:2-2, we hold that to establish sufficient cause for the removal, the custodial parent initially must show that there is a real advantage to that parent in the move and that the move is not inimical to the best interests of the children. Removal should not be allowed for a frivolous reason. The advantage, however, need not be a substantial advantage but one based on a sincere and genuine desire of the custodial parent to move and a sensible good faith reason for the move. To establish that the move is not inimical to the best interests of the children, the moving party must show that no detriment to the children will result from the move. For example, if a child were attending a special education program or receiving medical care which was not available in a comparable form in the area where the custodial party wished to move, or if a child had a medical problem which would be aggravated by the move, the threshold requirement would not be met. The decision as to whether the moving party has met the threshold requirement does not include consideration of the visitation issue. It is only after the custodial parent establishes these threshold requirements that the court should consider, based on evidence presented by both parties, visitation and other factors to determine whether the custodial parent has sufficient cause to permit removal under the statute.
The first factor to be considered in the prospective advantages of the move in terms of its likely capacity for either maintaining or improving the general quality of life of both the custodial parent and the children. The second factor is the integrity of both the custodial parent's motives in seeking to move and the noncustodial parent's motives in seeking to restrain such a move (e.g., whether the custodial parent is motivated by a desire to defeat and frustrate the noncustodial parent's visitation rights and remove himself or herself from future visitation orders or whether the noncustodial parent is contesting the move mainly to impede the custodial parent's plans or to secure a financial advantage with respect to future support payments). And the third factor is whether, under the facts of the individual case, a realistic and reasonable visitation schedule can be reached if the move is allowed. In a given case, evidence of any of these factors may be used to militate against either the threshold showing of the custodial parent for removal, or the arguments of the noncustodial parent against removal.
A realistic and reasonable visitation schedule is one that will provide an adequate basis for preserving and fostering a child's relationship with the noncustodial *1382 parent if the removal is allowed. When there has been a pattern of weekend visitation, "a court should be loath to interfere with it by permitting removal of the children for frivolous or unpersuasive or inadequate reasons." D'Onofrio, supra, 144 N.J. Super. at 206, 365 A.2d 27, (citing Grove v. Grove, 26 N.J. Super. 154, 97 A.2d 505 (App.Div. 1953)). Such a pattern establishes the noncustodial's [sic] parent's interest in maintaining a good relationship with the child. Nevertheless,
[t]he court should not insist that the advantages of the move be sacrificed and the opportunity for a better and more comfortable life style for the mother and children be forfeited solely to maintain weekly visitation by the father where reasonable alternative visitation is available and where the advantages of the move are substantial. [Id. at 207, 365 A.2d 27.]
Since the noncustodial parent has the necessary information to demonstrate that an alternative visitation schedule is not feasible because of distance, time, or financial restraints, we place the burden on that parent to come forward with evidence that a proposed alternative visitation schedule would be impossible or so burdensome as to affect unreasonably and adversely his or her right to preserve his or her relationship with the child. We emphasize that more than a showing of inconvenience by the noncustodial parent is required to overcome a custodial parent's right to remove the children after he or she has met the threshold showing that the move would be a real advantage to him or her and would not be inimical to the best interests of the children. If, however, the noncustodial parent does present evidence that his or her relationship and visitation with the children would be adversely affected by the move, then the trial court must balance the competing interests of the parties.
The more evidence there is that the noncustodial parent's visitation with the children will be adversely affected, the more of a showing of compelling reasons to move must be made by the custodial parent. If it is shown that a noncustodial parent's visitation would be adversely changed or curtailed by the move, the court should require a very substantial or compelling showing of advantage by the custodial parent before allowing the move. We reiterate that the burden of proof is on the custodial parent to meet the threshold requirement. Once the custodial parent has met that threshold, the decision of the court will be based on a balancing of the evidence, presented by both parties, relating to the factors outlined above. Because they are fact-sensitive, no two cases are the same and it is therefore essential that the trial court have the flexibility to deal with unforeseen fact patterns.
491 A.2d at 613-14 (footnote omitted). The foregoing represents the law of New Jersey. I find it to be sensible and sensitive. Whether Florida's shared parental responsibility statute carries with it the same presumption as New Jersey's statute should be ultimately decided by our supreme court. I hope it will find such a presumption because of the upside to children which shared parental responsibility brings, subject to the following concern of Cooper:
We suspect that as with most custody and visitation issues the best method in each case depends to a great extent on the specific facts of that case.
Id. at 614-15.
Professor Laurance Hyde, Jr., has written as persuasively as anyone I know with respect to shared parental responsibility in his publication Child Custody in Divorce of which the Spring 1984 issue of Juvenile & Family Court Journal is comprised. Professor Hyde treats in a scholarly and evenhanded way the following topics: Historical Perspective, Tender Years Doctrine, Custody Arrangements, Modification of Custody, Enforcement and Mediation. His comments on pages 34 and 35 are eloquent and practical. Fortunately, thirty-five states now recognize some forms of "shared parental responsibility"  a term so much more meaningful than "joint custody" *1383 or "shared custody" or "alternating custody." It would benefit children if his work would be considered by trial and appellate judges responsible for these cases.
The Bar is assuming its responsibility in this area. One of the regular ABA Family Law Section's publication, Family Advocate, devoted a special winter issue, 1989, to Relocation, which is part of the children's library of this court.
The medical profession, too, is an indispensable discipline in our reaching towards informed judicial decisions involving children. Dr. C. Henry Kempe, who announced the battered child syndrome in 1962 and who conceived the nation's first child protection team, observed that judges generally do the right thing for children when they are fully informed. Dr. Kempe was a pediatrician. Dr. Judith S. Wallerstein is a psychologist. The recent profound and compassionate study, Second Chances (1989), authored by her and Sandra Blakeslee, now in our children's library, tells the forlorn tale of fathers, ten years after dissolution, who have not been part of shared parental responsibility and have been therefore "out of sight; out of heart" so that their children are deprived of the one opportunity to fulfill their potential  educationally, vocationally, intellectually and emotionally. The chapter in Second Chances on joint custody discusses California's version of children having two households, rather than the practice in Florida of primary residential responsibility.
Florida's law schools would make a contribution to the administration of justice, in my view, by studies of our shared parental responsibility law now that it has been in place for almost seven years, with a view to making it work  as it can  by an enlightened, selective use of all of the tools available to us judges, such as mediation; trained guardians-ad-litem for children; required parenting education; required psychological therapy for the parents; and exercise of the court's contempt powers and inherent authority to act in the best interests of the children.
Courts can further aid children by (a) expediting these cases because time to a child is light years away from that of an adult; (b) avoiding the cynicism that comes from watching parents set agendas other than the best interests of the child; (c) becoming informed in family issues by reading current literature on the subjects at hand; (d) making specific findings of fact and conclusions of law where the children are concerned; (e) diffusing the lawyers' emotional participation in their clients' battles, and (f) controlling the dissipation of the children's security in needless attorney fees and court costs.
ROBINSON, STEVEN D., Associate Judge, concurring specially.
The principles of law contained in existing precedent completely support the trial judge's well-considered and sensitive decision to restrict the relocation in this case. See DeCamp v. Hein, 541 So.2d 708 (Fla. 4th DCA 1989); Simon v. Simon, 435 So.2d 941 (Fla. 4th DCA 1983); Costa v. Costa, 429 So.2d 1249 (Fla. 4th DCA 1983); Matilla v. Matilla, 474 So.2d 306 (Fla. 3d DCA 1985). DeCamp and Matilla both adopt the relocation test of D'Onofrio v. D'Onofrio, 144 N.J. Super. 200, 365 A.2d 27, aff'd, 144 N.J. Super. 352, 365 A.2d 716 (1976).
Decision making in cases involving family relocations is unusually difficult and painful for trial judges. I am motivated to make an additional comment. I agree with Judge Glickstein that Cooper v. Cooper, 99 N.J. 42, 43, 491 A.2d 606 (1984), offers to these cases useful and necessary procedures, presumptions, and philosophic ideas. Each relocation case will differ according to its individual facts, so, therefore, a judge's intellectual integrity will be constantly tested. If discretion is subjectively exercised, these cases will turn according to each judge's personal normative values. Principled and objective precedents, such as Cooper and others cited herein, are needed to provide the trial courts a working structure. Each judge must maximally use this structure as a creative tool to objectively and ably analyze relocations. All this is needed to fairly blend parents' rights in a mobile society, a viable joint *1384 parental responsibility law and, most important, the best interests of our state's affected children.