144 N.J. Super. 200 (1976)
365 A.2d 27
DOMINICK D'ONOFRIO, PLAINTIFF,
v.
PHYLLIS D'ONOFRIO, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided August 12, 1976.
Supplemental opinion September 1, 1976.
*202 Mr. Leroy D. Safro for plaintiff.
Mr. Jerome L. Rubinowitz for defendant (Messrs. Rosenthal & Rubinowitz, attorneys).
*203 PRESSLER, J.C.C., Temporarily Assigned.
Following a plenary hearing pursuant to N.J.S.A. 9:2-2, the court granted the application of defendant Phyllis D'Onofrio for leave to remove her children, a boy of the age of six and a girl of the age of four, to South Carolina for purposes of establishing permanent residency there. The application was granted over the objection of the father of the children, Dominick D'Onofrio, who obtained a no-fault divorce from Mrs. D'Onofrio in December 1973 by a judgment granting her custody of the children subject to the father's unspecified and undefined right of "reasonable visitation." The order permitting the removal included provisions for specified future visitation in both New Jersey and South Carolina as well as provisions by way of security to ensure the return of the children for the New Jersey visitation. This opinion is filed pursuant to R. 2:5-1 (b) to further elucidate the court's reason for granting the application in view of the father's appeal from the removal order.
The court is keenly aware that of all adjudicatory proceedings, none requires greater judicial thoughtfulness nor imposes graver judicial responsibility than the delicate and sensitive litigation which involves the status of young children or which may affect to any substantial degree existing parental relationships. The resolution of the issue here presented, essentially one of visitation, concededly does not implicate the same degree of wrenching emotional content and permanency of consequence inevitably involved in contested adoption and custody actions. It is nevertheless of critical significance to the lives of both of these parents and their children. The issue is also one of sufficient importance to have invoked a clear and long-standing statement of legislative policy, namely, that children of divorced parents not be removed from this jurisdiction without the consent of the non-custodial parent "unless the court, upon cause shown, shall otherwise order." N.J.S.A. 9:2-2. The questions to be here determined then, in view of this anti-removal policy and its evident purpose, are first, the factors *204 and considerations which constitute an adequate showing of cause for relieving the custodial parent of the obligation to remain with the children in this jurisdiction, and second, whether such a showing was here made by the mother.
It is instructive in dealing with these questions to consider N.J.S.A. 9:2-2 and its cognate provision, N.J.S.A. 9:2-4, in their historical context. At common law the father, unless unfit or otherwise disqualified, had the superior right to the custody of his minor children, a right only modestly qualified in 1860 by legislative fiat  see L. 1860, c. 437, which required the awarding of custody of children under the age of seven to the mother, if fit, where the parents were separated but not divorced. What is most suggestive, however, about the 19th Century expressions of purportedly strict common-law and statutory dictates was the articulated and applied concept that the actual criterion of parental fitness was its consonance with the child's well-being as judicially determined. See, e.g., State, Baird, pros. v. Baird and Torrey, 21 N.J. Eq. 384, 388-389 (E. & A. 1869). The recognition of the paramountcy of the child's welfare was, of course, the touchstone of the reform legislation of 1902 from which, among other matters, N.J.S.A. 9:2-2 and 9:2-4 derive.
Thus, N.J.S.A. 9:2-4 declares that the custodial rights and obligations of both parents are equal and that it is the "happiness and welfare" of the children which shall be determinative of the custodial question. N.J.S.A. 9: 2-4 also enjoins, without qualification or exception, the removal of the children from this jurisdiction "where the mother or father resides in this State and is the suitable person who should have the custody of such child for its best welfare." (Emphasis added). The main thrust of the anti-removal provision of N.J.S.A. 9:2-4 was clearly to prevent the defeat of an award of custody either already made or pending. The thrust of the anti-removal provision of N.J.S.A. 9:2-2, however, is addressed not primarily to the basic custodial question but rather to the preservation *205 of the mutual right of the children and the noncustodial parent to develop and maintain their parental relationship after custody has already been awarded to the other parent, a relationship based upon that institution which has come to be known as "visitation." Unlike its N.J.S.A. 9:2-4 counterpart, the anti-removal provision of N.J.S.A. 9:2-2 is subject to the exercise of judicial discretion and this, patently, because of the legislative recognition of the obvious fact that visitation by the non-custodial parent is not inherently incompatible with the residency of the children in another state. Thus, when our courts speak of the "cause shown" criterion of N.J.S.A. 9:2-2 in terms of the best interests and welfare of the child, they speak, as a matter of content, not to the whole range of considerations which must be taken into account in deciding which of the parents shall have custody. They speak rather to one aspect of the child's welfare, namely his interest in continuing, by appropriate visitation, as reasonable, healthy and affectionate a relationship as possible with the parent with whom he does not reside. See, e.g., Smith v. Smith, 85 N.J. Super. 462, 468-469 (J.D.R. Ct. 1964); Salmon v. Salmon, 88 N.J. Super. 291, 309 (App. Div. 1965); Parivash v. Yousef, 94 N.J. Super. 403 (App. Div. 1967); Daly v. Daly, 39 N.J. Super. 117, 123-124 (J.D.R. Ct. 1956), aff'd 21 N.J. 599 (1956); Casteel v. Casteel, 45 N.J. Super. 338, 353 (App. Div. 1957); In re Shaheen, 127 N.J. Eq. 75 (E. & A. 1939).
Even under the best of circumstances and where the custodial parent is supportive of a continuing relationship between the child and the noncustodial parent, the nature of a parental relationship sustainable by way of visitation is necessarily and inevitably of a different character than that which is possible where the parents and children reside together as a single-family unit. The fact remains that ordinarily the day-to-day routine of the children, especially young ones, and the quality of their environment and their general style of life are that which are provided by the custodial parent *206 and which are, indeed, the custodial parent's obligation to provide. The children, after the parents' divorce or separation, belong to a different family unit then they did when the parents lived together. The new family unit consists only of the children and the custodial parent, and what is advantageous to that unit as a whole, to each of its members individually and to the way they relate to each other and function together is obviously in the best interests of the children. It is in the context of what is best for that family unit that the precise nature and terms of visitation and changes in visitation by the noncustodial parent must be considered.
Where the residence of the new family unit and that of the noncustodial parent are geographically close, some variation of visitation on a weekly basis is traditionally viewed as being most consistent with maintaining the parental relationship, and where, as here, that has been the visitation pattern, a court should be loathe to interfere with it by permitting removal of the children for frivolous or unpersuasive or inadequate reasons. See Grove v. Grove, 26 N.J. Super. 154 (App. Div. 1953). Where, however, the custodial parent can demonstrate that a real advantage to herself and the children will result from their removing their residence to a place so geographically distant as to render weekly visitation impossible, then the court must weigh a number of determinative factors in order to accommodate the compelling interests of all of the family members. It should consider the prospective advantages of the move in terms of its likely capacity for improving the general quality of life for both the custodial parent and the children. It must evaluate the integrity of the motives of the custodial parent in seeking the move in order to determine whether the removal is inspired primarily by the desire to defeat or frustrate visitation by the noncustodial parent, and whether the custodial parent is likely to comply with substitute visitation orders when she is no longer subject to the jurisdiction of the courts of this State. It must *207 likewise take into account the integrity of the noncustodial parent's motives in resisting the removal and consider the extent to which, if at all, the opposition is intended to secure a financial advantage in respect of continuing support obligations. Finally, the court must be satisfied that there will be a realistic opportunity for visitation in lieu of the weekly pattern which can provide an adequate basis for preserving and fostering the parental relationship with the noncustodial parent if removal is allowed. The court should not insist that the advantages of the move be sacrificed and the opportunity for a better and more comfortable life style for the mother and children be forfeited solely to maintain weekly visitation by the father where reasonable alternative visitation is available and where the advantages of the move are substantial. It is at least arguable, and the literature does not suggest otherwise, that the alternative of uninterrupted visits of a week or more in duration several times a year, where the father is in constant and exclusive parental contact with the children and has to plan and provide for them on a daily basis, may well serve the paternal relationship better than the typical weekly visit which involves little if any exercise of real paternal responsibility.
It is further clear that a noncustodial parent is perfectly free to remove himself from this jurisdiction despite the continued residency here of his children in order to seek opportunities for a better or different life style for himself. And if he does choose to do so, the custodial parent could hardly hope to restrain him from leaving this State on the ground that his removal will either deprive the children of the paternal relationship or depreciate its quality. The custodial parent, who bears the essential burden and responsibility for the children, is clearly entitled to the same option to seek a better life for herself and the children, particularly where the exercise of that option appears to be truly advantageous to their interests and provided that the paternal *208 interest can continue to be accommodated, even if by a different visitation arrangement than theretofore.[1]
Relating these observations to the facts here as found and hereafter recited, the court is satisfied that the move here contemplated should be allowed.
Mrs. D'Onofrio now resides with the children in an apartment in Garfield, New Jersey, which is located on a busy and heavily trafficked street and which has no suitable and convenient play area. The rental of $235 a month for minimal housing accommodations is unfortunately consistent with the general housing market in Bergen County. At the time of the divorce in 1973 her husband, a policeman employed by the Borough of Lodi, was ordered to pay alimony in the amount of $10 a week and child support in the amount of $20 a week per child. He is now paying a total of $53 weekly pursuant to an escalation formula contained in the judgment. Formerly in receipt of a welfare grant to supplement the support paid by the father, she is now employed by the Bergen County Welfare Board as a home service aid at a take-home pay of $90 a week. In addition, her job entitles her to child care facilities at the Welfare Board's expense while she works. Although she is a trained bookkeeper, she cannot find employment in that field at a salary high enough to compensate her for the child care assistance she *209 would lose by giving up her present job. Adding to the child care difficulties is the fact that the elder child is hyperactive, a condition for which the mother sought therapy and counseling for herself and her son at the South Bergen Mental Health Clinic, a local community facility in East Rutherford. This treatment, however, terminated upon their move to their present Garfield address. The child has, however, been seen recently on several occasions by the Garfield school psychologist.
Born in Rock Hill, South Carolina, where most of her large family still resides, Mrs. D'Onofrio came to New Jersey when she was 11 years old. She was married here and the children were born here. Although her father still lives in New Jersey, he is planning to return to Rock Hill upon his retirement within the next year. Her mother, who has been supportive of her and the children both financially and otherwise, is now also in Rock Hill, nursing her own mother in what appears to be a terminal illness, and will either remain there to await her husband's arrival or will return here temporarily to make the permanent move with him. Despite the distance between Mrs. D'Onofrio and her family in Rock Hill, they have remained close throughout the years. The children, having frequently visited Rock Hill, are confident and happy there and, to the limited extent that they understand what is involved, look forward to the move.
Mrs. D'Onofrio finds her situation difficult, and with obvious justification. She is employed, taking care of the children essentially on a 24 hour a day basis, has barely enough income to meet the family's needs, and is receiving from her former husband not only minimal financial support but also very little support and assistance in the burdens of raising the children. Although she has genuinely attempted to maintain herself and her children in New Jersey, she has now concluded that they would manage better by returning permanently to Rock Hill. She has found employment there as a bookkeeper for a chemical company *210 at a starting net salary of $147 a week. She has located a desirable apartment in a garden-type complex bordering a wooded area and providing superior recreational facilities for the children at a monthly rental of $155. She will be near her family, including not only her parents and siblings but also cousins, aunts, uncles, nieces and nephews, some of whom will be available to help with child care. Not only will the standard of living and physical environment of the mother and the children be considerably improved but they will also enjoy the benefits of being surrounded by a large and helpful extended family.
Now as to the paternal considerations. The father, since the divorce, has been seeing the children every Friday, on birthdays and holidays. He sometimes picks them up at their home, but more often Mrs. D'Onofrio takes them to his parents' home, which appears to be the visitation headquarters. Although he spends time with them there, he frequently leaves them for part of the day with their grandmother, with whom Mrs. D'Onofrio enjoys a cordial relationship. Mrs. D'Onofrio, who candidly admits that the children love their father, has repeatedly asked him to keep them with him overnight, but he has never yet done so, claiming both that the fact of his employment is inconsistent with such an arrangement and that, having remarried, he doesn't have room for them. His claimed net income from his municipal employment after payment of taxes, alimony and support is in excess of $8,000. There are no children of the present marriage. His second wife works, but her income was not indicated. Mrs. D'Onofrio suggested, but he denied, that he earns additional income by moonlighting. As to his attitude toward the proposed move, the court accepts Mrs. D'Onofrio's testimony, despite her former husband's variant version, that when she first discussed it with him, he had no objection provided she would agree to forego the weekly child support and would arrange to transport the children to New Jersey for visitation at Christmas, Easter and during the summer.
*211 The court found Mrs. D'Onofrio to be an impressive and credible witness and a concerned, sensitive and effective parent. It is true that the visitation problems which typically come before the courts are those of the noncustodial parent seeking to enforce his visitation rights which the custodial parent is trying to subvert. As one court was compelled to observe, "Experience has shown that only too often, unless the court exercises its power to protect the welfare of the children, a separated wife is not likely to provide reasonable visitation privileges voluntarily. The children may well be used as weapons to inflict punishment upon the other parent for real or imagined wrongs." Smith v. Smith, supra, 85 N.J. Super. at 469. Without detracting from the force of that observation, it must nevertheless be kept in mind that that is the situation the courts see. They are not confronted, because there is no legal basis therein for relief, with the converse situation of the custodial parent who genuinely seeks to encourage a greater degree of participation and responsibility by a noncustodial parent who assumes either no role or, as here, a minimal role with the children. The court is obliged to conclude that had the father here extended himself further on behalf of the children, both financially and otherwise, the mother would not have felt compelled to make this move.
In view of all of the foregoing, this court is satisfied that the mother has shown the required cause. She has expressed her desire, not merely her willingness, to transport the children to New Jersey so that they can spend two weeks with their father during the summer, one week at Christmas and one week in the spring. The court has ordered her to do so and is confident of her intent to comply with that order. Hopefully, the father will be able to make arrangements to accommodate them even though those visits will make greater demands of him than the weekly visits he now shares with his mother. The order also accords him liberal visitation in South Carolina and further permits him to withhold $15 a week of his support payments to create a *212 source of funds to pay for the children's transportation to New Jersey. That visitation being practical and realistic, this court could not in good conscience, and simply because weekly visitation may be more convenient for the father, require this mother and her children to endure indefinitely their separation from family, their present subsistence level and their continuing financial struggle when happier prospects are already within their grasp.
NOTES
[1] In view of the court's interpretation of N.J.S.A. 9:2-2 and its application to the facts here presented, it need not consider the apparent constitutional questions implicit in the statute, namely whether restraining the mother from leaving the State with the children who are in her custody offends either the equal protection provision of the Fourteenth Amendment or the fundamental constitutional right to travel, absent a compelling state interest which cannot be otherwise accommodated. See, e.g., Edwards v. California, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1948); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); Aptheker v. Sec. of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1963); U.S. v. Guest, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1968); Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1971).