[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This case arises from a motion to permit defendant mother, a joint legal and physical custodian, to relocate with the children from Connecticut to Maryland.
Relocation disputes are increasing in number and intensity as our society attempts to adjust to the complications generated by dissolutions of family units. Those complications are further intensified by remarriage, a fluctuating economy, the evolving roles of women, the increasing mobility of our society and other social phenomenon.
The proliferating disputes now represent a significant portion of this court's docket and would benefit from a clear statement of the criteria to be used in determining if relocation is in the best interests of the minor children involved.
Connecticut has not yet had the benefit of an appellate CT Page 7761 review of relocation criteria in its most virulent form, post dissolution. In the absence of such a review, this court has looked to Miggins v. Senofonte, FA 93 03903685, Hartford-New Britain at Hartford, McWeeney, J., July 26, 1996, a well reasoned decision.
Miggins, adopts the criteria set forth in D'Onofrio v.D'Onofrio, 144 N.J. Super. 200, 365 A.2d 27, aff'd 144 N.J. Super. 352,365 A.2d 716 (App.Div. 1976). The D'Onofrio criteria have been followed in Florida, Massachusetts, Michigan, Nevada, North Carolina, Tennessee, Vermont, Wyoming, Arkansas, and New Jersey.Miggins found D'Onofrio "persuasive as policy and helpful in application." This court agrees and adopts those criteria as a basic foundation for evaluating relocation issues:
1. The prospective advantages of the move in terms of its likely capacity for improving the general quality of life for both the custodial parent and the children.
2. The integrity of the motives of the custodial parent in seeking the move. Whether the removal is inspired primarily to defeat or to frustrate visitation by the noncustodial parent and whether the custodial parent is likely to comply with substitute visitation orders when no longer subject to the jurisdiction of the courts of this state.
3. The integrity of the noncustodial parent's motives in resisting the removal.
4. The court must be satisfied that there will be a realistic opportunity for visitation in lieu of the weekly pattern which can provide an adequate basis for preserving and fostering the parental relationship with the noncustodial parent if removal is allowed.
In its discussion of the parameters, D'Onofrio goes on to establish three basic principles.
First, it suggests the court should not insist that the relocation advantages be sacrificed, and a better lifestyle for the custodial parent and the children be forfeited, solely to maintain weekly visitation by the noncustodial parent where reasonable alterative visitation is available and where the advantages of the move are substantial. CT Page 7762
Of course, as relocation case law continues to develop, definitions of "reasonable alterative visitation" and "substantial" "advantages" will evolve as trial court interpretations reflect the varying fact patterns presented to them.
D'Onofrio then introduces the possibility that uninterrupted visits of a week or more several times a year, where the noncustodial parent is in constant and exclusive parental contact and has to plan and provide daily for the children, may well serve the parenting relationship better than the typical weekly visitation which involves little if any real parenting responsibility. D'Onofrio comments that this possibility is uncontradicted by the literature.
With that comment, D'Onofrio is giving recognition to still another segment of family law where our courts are dependant upon child development research ("the literature") to guide our decisions. When that burgeoning science deals with this issue, and offers us validated research, the court will have credible direction, untainted by anecdotes or personal predilections.
Finally, D'Onofrio notes that a noncustodial parent is perfectly free to leave the jurisdiction, despite the children's continuing residency, in order to seek a better or different lifestyle. If that parent chose to do so, the custodial parent could hardly hope to restrain the non- custodial parent on the grounds that removal would either deprive the children of that relationship or depreciate its quality. The custodial parent is entitled to the same option, says D'Onofrio, particularly where relocation is truly advantageous and where the noncustodial parent can continue to be accommodated, even if by a different visitation schedule.
As family law continues to develop, practitioners representing custodial parents may well begin to test new boundaries, and begin to explore the willingness of a court to restrict the relocation of a noncustodial parent "in the best interests of the child." Should that day arrive, the freedom of each parent to relocate will have to be considered in a new light.
Unless the facts of the case dictate otherwise, divorce should not empower a non-custodial parent to control the major life decisions of a custodial parent. Divorce is intended to CT Page 7763 sever that control. As a corollary, divorce should not empower a custodial parent to arbitrarily excise the non-custodial parent from the childrens' lives. Alienation should not be countenanced. Those difficult balances can be achieved only through painstaking exploration of the disparate facts in each relocation case.
Based upon a preponderance of the credible, relevant and legally admissible evidence, the court finds as follows:
The parties signed a Separation Agreement which established the terms of the uncontested divorce decree. They agreed to, and were granted, joint legal and physical custody of their two minor children, Chase, now aged eleven, and Garrett, now aged seven. There were no specific visitation schedules, nor was any child support ordered. The judgment has not been modified since the date of the judgment, September 23, 1993.
After the divorce, the parties continued to reside together in the family home from September of 1993 until July of 1994. During those ten months of post dissolution cohabitation they continued to co-parent substantially the same way they had when they were married: mother primarily organized the children's schedules; she and father both participated in those activities.
After July of 1994, father relocated to Ledyard, outside the childrens' school district. He rented two rooms in the home of Bill Cook. Mother rented a home in the childrens' school district in Gales Ferry.
The children lived with mother during the week and spent three out of four weekends, from Friday at 5 pm until Sunday at 8 pm with their father. The children also spent Wednesday with their father, from 4 pm until 8 pm. Although the children did not typically spend overnights with their father during the week, he did see them frequently.
Father began working for United Parcel Service in December of 1994 on weekdays from 3 am to 9 am. Father has had 13 jobs since the marriage in 1985. Two were full time. Father recently left UPS and is now employed by his landlord, Bill Cook, as an insurance salesman for Mr. Cook's Allstate Insurance agency.
Father has a limited social network in Connecticut, although he began dating Lisa Dutilly in the beginning of the year and reports he has developed a close relationship with her. CT Page 7764
Neither mother nor father have any family members in the northeast. Both are from Illinois, where their families still live. The children spend two weeks of every summer in Illinois with their maternal and paternal grandparents, who coordinate their schedule.
Mother has not used her custodial role to frustrate father's access or that of his family. To the contrary, her behavior with regard to child access has been exemplary. There is no claim by father that mother's relocation is inspired, to any degree, by a desire to defeat or frustrate father's access to the children. Nor does the court find any.
Father suffers from Attention Deficit Disorder and depression. During the divorce, father attempted suicide twice — by overdose and by carbon monoxide poisoning. He did not tell his wife of his attempts or of his depression. He advised his treating psychiatrist, Dr. Jeffrey Klugman, that he "never finished projects, is easily distracted, loses things, doesn't keep jobs long, was fired twice, is disorganized, and (left school) five credit hours short of receiving his bachelor's degree." His condition is controlled by 300mg of Wellbutrin, a medication he must take daily.
Mother began dating Dr. Philip Colangelo, an employee of Pfizer. Dr. Colangelo, who holds both a Doctorate in Pharmaceutical Sciences and a Doctorate in Pharmacy from the University of Kentucky, was asked to resign from Pfizer in October of 1994. He immediately undertook a comprehensive job search in Connecticut, supervised and guided by a vocational professional of impressive skills and insights, George Cunningham. The focus was on finding employment that would not require relocation. There were no available jobs in Dr. Colangelo's field, pharmacokinetics, in Connecticut at that time, nor are there any at the present time. Dr. Colangelo and George Cunningham then expanded their search beyond Connecticut, but limited it to the northeast, still seeking to minimize relocation.
Mother advised father in July of 1995 that she would soon become engaged to Dr. Philip Colangelo, whom she had been dating for more than a year. Father was told immediately when the engagement took place, in August of 1995. CT Page 7765
After all efforts to find employment in Connecticut, and then in the northeast, proved to be unsuccessful, plaintiff father and defendant mother began discussing relocation to North Carolina. Father thought he could consider living there. Dr. Colangelo interviewed for a job in that state, unsuccessfully. Maryland was discussed. Father decided not to move from Connecticut. Dr. Colangelo found employment in Maryland with the Food and Drug Administration, as a pharmocokinetisist. Mother, a biochemist, who earned her degree from the University of Illinois in 1989, while raising Chase, giving birth to Garrett and working part-time to support the family, also found a job in her area of expertise with the FDA in Maryland.
Dr. Colangelo testifies to very satisfying working conditions with the FDA. His diabetic condition and his blood-glucose levels have improved substantially in the new and less stressful work environment. Mother has not yet begun her FDA job, opting to take the time necessary to first blend the children into their new environment. When they are both on the job, their family will benefit from a substantial joint income. And the existence of "flex time" will enable them to stagger their work schedule and be available to the children when needed. The FDA does not require evening, holiday or weekend work, unlike Pfizer.
Father seeks to have the children remain in Connecticut with him. Continued stability is his rationale. He also rejects moving to Maryland because he is beginning a new job and because his girl friend does not have physical custody of her children and would forfeit much visitation if she were to relocate.
Father is a good and loving parent. He is, however, somewhat limited in his skills and judgment. Mother is more competent and credible. When offered an opportunity to speak ill of father, she declined. When invited to attack him, she demurred. Father was unable to restrain himself from speaking harshly of her social patterns and activities when his attorney opened the door and invited him through. It was a raw accusation, unsubstantiated by any credible evidence or witness. As someone who has benefited substantially from mother's good will, father's outburst showed poor judgment.
The children enjoy a good relationship with both Dr. Colangelo and Lisa Dutilly.
Chase has expressed a preference for remaining in Connecticut CT Page 7766 at his school and with his friends. Not living with his mother would be traumatic for Garrett. Chase has a greater ability to adjust to leaving his school and friends than Garrett would in adjusting to the loss of his mother.
All of the activities the boys enjoy in Connecticut are available to them in Maryland. While visiting in Maryland, they have each made friends.
Father began his insurance sales job at the beginning of September. He must renew his expired insurance license in order to maintain the job. No medical insurance will be provided to him through Allstate. If he does not obtain ample coverage, his psychiatric care and prescriptions will cost him $273 a month. Father's income in the past has been both limited and sporadic. His new employer, Bill Davis, speaks in glowing and seductive terms of father earning $1000 a week within a month or so as a salesman in his Allstate agency. Although father has not referred to that potential when rejecting a move to Maryland, the court suspects that Bill Cook's assurances have played a substantial role in keeping father focused on Connecticut.
Father's checking account has been consistently overdrawn for the past six months.
Father recently changed churches and changed the denomination he attends while with the children here in Connecticut.
The relocation offers mother and the children the opportunity to improve the general quality of their life.
Mother's exemplary history leaves little doubt that she will continue to comply with the visitation orders of this court in the future as wholeheartedly as she has in the past.
Father's motives for resisting the relocation are not in question.
Finally, a visitation schedule is available to provide father with a base for preserving and fostering his parental relationship with the children.
Norma Damato, the Family Services Counselor who evaluated the family in this case, recommends that mother have primary physical custody of the children in Maryland. Her recommendations for CT Page 7767 father's visitation have been largely adopted by mother. Her recommendation that the parents share the transportation expenses have been substantially exceeded by mother.
Having reviewed the evidence and the sworn financial affidavits of each of the parties in the context of the required considerations set forth in Title 46b, Chapter 815j of the Connecticut General Statutes, the following orders shall enter:
1. CUSTODY
A. Legal custody of Chase and Garrett is awarded jointly to both parents.
B. The children's primary physical residence shall be with defendant mother.
2. ACCESS
A. Father is granted liberal and flexible access to include:
1. one weekend per month, from Friday afternoon until Sunday evening.
a. Said one weekend per month shall extend from Friday afternoon to Monday evening on Martin Luther King Day, President's Day, Memorial Day, Labor Day, Columbus Day, Veteran's Day weekends and other school holidays falling the day before or the day after one weekend per month.
2. a. The parties will share equally the Christmas school vacation, annually alternating the half that includes Christmas Eve and Christmas Day, and shall alternate Thanksgiving as a four day holiday each year.
b. Plaintiff father shall have access to the children during their Easter school vacation.
3. The minor children shall spend two weeks in Illinois every summer with their paternal and maternal grandparents, two weeks of her choice with defendant mother and the balance of their school summer vacation with their father.
3. CHILD SUPPORT CT Page 7768
In view of plaintiff father's current limited income ($400 gross per week) and his significant visitation expenses, no child support payments shall be required of father at this time. The court reserves the right to revisit the child support issue as father's income increases substantially, as both father and his current employer, Bill Cook, confidently anticipate.
4. TRANSPORTATION
At this time, in consideration of father's current limited income, defendant mother has agreed to be solely responsible for all airfare costs of Plaintiff father's visitations with the children in Connecticut. This court incorporates that generous offer as an order of this court. Here, too, the right to revisit this issue as father's income increases substantially is reserved.
5. MEDICAL INSURANCE
Defendant mother shall maintain medical insurance for the minor children. The parties shall share equally all uninsured medical, dental and mental health expenses.
Judge Joseph L. Steinberg