## Alexander v. Berg

C.P. of Dauphin County, no. 407 S 1996.

*Paul J. Esposito,* for petitioner.
*John J. Connelly,* for respondent.

KLEINFELTER, *J.,* November 26, 1996—This matter came before the court on a complaint for custody filed by Roland R. Alexander M.D., against his former wife, Martha L. Berg, concerning two children born of the marriage, Theodore ("Ted"), born June 11, 1981, and Rachel, born April 21, 1985. Pursuant to local rule a custody conciliation conference was scheduled for March 8, 1996, and an interim order was entered by this court on March 13, 1996. Thereafter, hearings were held on June 11, 1996 and July 1, 1996. Our final custody order was entered July 16, 1996.

On August 1, 1996, Ms. Berg filed a notice of appeal to Superior Court. On August 6, 1996, we directed defendant to file a concise statement of matters complained of on appeal and set a briefing schedule. The statement was filed on August 20, 1996, and both sides have filed their memorandums of law.

Although this court denied Dr. Alexander's request for primary physical custody and continued same with Ms. Berg, our custody order directed "that Mother shall retain her residence in the greater Harrisburg area." It is the latter condition that Ms. Berg challenges on appeal. Additionally, she claims a violation of Pa.R.C.P. 1915.11(b) which provides the procedure to be followed when the court elects to interrogate a child. We will address the latter issue first.

The law concerning court interrogation of a child is not in dispute. Pa.R.C.P. 1915.11(b) provides:

"The court may interrogate a child, whether or not the subject of the action in open court or in chambers. The interrogation shall be conducted in the presence of the attorneys and, if permitted by the court, the parties. The attorneys shall have the right to interrogate the child under the supervision of the court. The interrogation shall be part of the record."

This rule follows the procedure approved by our Superior Court. See *e.g., Gerald G. v. Theresa G.,* 284 Pa. Super. 498, 426 A.2d 157 (1981); *Commonwealth ex rel. Lee v. Lee,* 248 Pa. Super. 155, 374 A.2d 1365 (1977). This procedure assures the due process rights of the parties and provides a record for purposes of review.

At the conclusion of the testimony in the present case, the court advised counsel:

"THE COURT: As far as my speaking with the children, I will tell you my preference, and then you will tell me what you want to do.

My preference is to speak with each one of them separately and alone. However, you should know that you have the right to be present during my questioning and even to have any questioning transcribed if you want to do it that way.

Let me hear any objections to my way.

MR. CONNELLY: Can you just give me a minute to talk to my client about this, Your Honor?

THE COURT: Yes.

(Pause.)

MR. CONNELLY: Your Honor, my client has no objection to that procedure. He asked that since I have met the children, I could at least introduce them. I think Paul has met them too.

THE COURT: Certainly, I would like you to introduce them.

THE COURT: Mr. Esposito?

MR. ESPOSITO: We have no objection to the court's procedure.

THE COURT: All right then. We will stand in recess. It doesn't matter which one I talk to first. Either one of them you would like to bring back.

(Recess.)" (N.T. B-74, B-75.)[1]

It has been our experience in the past that direct and cross-examination of children before a judge and court reporter—even in chambers—creates a very intimidating atmosphere; it is rarely conducive to any meaningful fact-finding. The trauma-to-benefit ratio simply does not, in our experience, justify an adversarial examination. For this reason we usually do not invite the interrogation of a child witness by counsel or the court.

Nevertheless, we believe it beneficial that the court meet the children which are the subject of the dispute. (Children are excluded from the courtroom during the testimony of their parents and others.) During our meeting we explain to the children the role of the court in making a custody decision and the various options we have. We explain that any decision we make is arrived at with their best interests in mind. We will ask them for their preference without probing their answers. The entire experience, rarely over five minutes in length, is not designed to elicit facts but to allow the judge and children to become briefly acquainted.

The action taken by the court in this case followed the above pattern. The ultimate decision reached in

---

1. References to the notes of testimony from June 11, 1996 carry an "A" prefix; those from July 1, 1996 carry a "B" prefix.

our order was not influenced by our brief meetings with the children, nor was any opinion expressed by them contrary to that relayed to the court through the on-the-record testimony. Here, counsel for defendant, after conferring with his client, waived her right to be present and to have a record after being specifically advised of these rights. It was only after the record was closed that defense counsel corresponded with the court requesting "testimony" of the children.[2] Such a request was untimely and, under all the circumstances of this case, inappropriate.[3]

We turn now to the principal issue raised by Ms. Berg on appeal: Did the court abuse its discretion in conditioning its award of primary custody to Mother by limiting her residence to the greater Harrisburg area and thereby defeat her intended relocation to Pittsburgh?

In an exhaustive and insightful opinion by Judge Beck, our Superior Court has outlined the factors which a trial court must consider in weighing the competing interests inherent in any "relocation" case:

"First, the court must assess the potential advantages of the proposed move and the likelihood that the move would substantially improve the quality of life for the custodial parent and the children and is not the result of a momentary whim on the part of the custodial parent. . . .

---

2. Defendant also filed a petition to take testimony of minor children on July 10, 1996, which was denied by order dated July 16, 1996.

3. It should be noted that the preferences of the children were fully explored by Dr. Shienvold who met with each child on three separate occasions. (N.T. A-6.) He expressed their preferences for the record. (N.T. A-18-19.) Rachel's preference was also expressed by Dr. Thornsley. (N.T. A-160.)

"Next, the court must establish the integrity of the motives of both the custodial and non-custodial parent in either seeking the move or seeking to prevent it. . . .

"Finally, the court must consider the availability of realistic, substitute visitation arrangements which will adequately foster an ongoing relationship between the child and the non-custodial parent." *Gruber v. Gruber,* 400 Pa. Super. 174, 184-85, 583 A.2d 434, 439 (1990) (trial court's order denying relocation reversed).

*Gruber* has been followed in *Plowman v. Plowman,* 409 Pa. Super. 143, 597 A.2d 701 (1991); *Lee v. Fontine,* 406 Pa. Super. 487, 594 A.2d 724 (1991); *White v. White,* 437 Pa. Super. 446, 650 A.2d 110 (1994); *Vineski v. Vineski,* 450 Pa. Super. 183, 675 A.2d 722 (1996) and *Gancas v. Schultz,* 453 Pa. Super. 324, 683 A.2d 1207 (1996).

As might be imagined, each of these cases is very fact specific so that any application of the *Gruber* standards must begin with a review of the relevant facts. The record establishes that, at the time of the hearings, each party was 47 years of age. The parties met in Arizona in 1979 [4] when Dr. Alexander was enrolled in the University of Arizona Medical School from which he was graduated in 1979. The parties moved to Rhode Island for Dr. Alexander's internship and residency. The parties were married on April 5, 1980. They moved to Springfield, Massachusetts in 1981 for Dr. Alexander's third year of residency and, in 1984, moved to Pittsburgh where, at the University of Pittsburgh, Dr. Alexander was a fellow in oncology. The parties

---

4. Dr. Alexander was born in Detroit, Michigan but raised in Tuscon, Arizona (N.T. A-61); Ms. Berg was born and raised in Pittsburgh. (N.T. 188.)

next moved to Harrisburg where, on April 1, 1986, Dr. Alexander began his employment as a private practice oncologist. At the time, son Ted was almost 5 years old and daughter Rachel, not yet 1 year of age. (N.T. A-59-63.)

After renting a house for a year, the parties decided that this is where Dr. Alexander would build his career and make their home. The parties purchased a home in Fishing Creek Valley where Ms. Berg and the children reside today. (N.T. A-64-65.) The parties separated on September 1, 1992 and were divorced on September 13 or 14, 1995. Dr. Alexander remarried on September 17, 1995. (N.T. A-60.)

Ms. Berg has a bachelor's degree from Smith College in Northampton, Massachusetts and a master's degree in international administration from Brattleboro, Vermont. During the marriage Ms. Berg was not employed outside the home. (N.T. A-65-66) (N.T. B-3, 27.) It was her plan to continue as a full-time homemaker until Rachel was in the first grade. At that time, she intended to develop other interests, primarily historical research (N.T. A-186.) In the interim, Ms. Berg has performed volunteer work at St. Stephen's School in a part-time teaching capacity and been active on their board of directors, and curriculum development committee. (N.T. A-66.) She also took a course at Penn State which involved doing a research paper at the Cumberland County Historical Society. (N.T. B-9.)

Since the parties' separation in September of 1992, primary physical custody has remained with Ms. Berg. Dr. Alexander has provided daily transportation from their home in Fishing Creek Valley to the private schools in which each child is enrolled, *i.e.,* St. Stephen's for Rachel and Harrisburg Academy for Ted. Additionally, Dr. Alexander picks up the children after school each

Wednesday and they stay with him overnight. Father also has physical custody of the children on the first and third weekend of each month. The parties shared the major holidays and the summer vacation period. No formal order had been entered prior to ours of July 15, 1996. (N.T. A-67-73.) Although the children—particularly Rachel—had the usual emotional adjustments to make to their parents' separation, both are doing well now. (N.T. A-158, 176.)

We turn now to the first prong of Gruber, *i.e.,* whether the proposed move will significantly improve the general quality of life for the parent and the children. When asked why she considered a move to Pittsburgh, Ms. Berg explained that she needed to think about making a living for herself and that she would benefit from retraining. She had done freelance historical research and wished to pursue a career in archival management. (N.T. 192-93.) She further explained:

"I'm really looking forward to a chance to engage my intellect in a challenging academic program and to look for challenging work following that. I have not found opportunities to do that here; to pursue graduate studies here." (N.T. 199.)

When questioned as to her financial need as a reason to return to school and obtain part-time employment (N.T. B-33), Ms. Berg allowed that her intended field was "not a lucrative position" and might pay between $15,000 and $30,000. (N.T. B-34.)

Presently, Dr. Alexander provides $3,600 per month of child support and alimony. The alimony will end in 1999; however, the child support ($1,200 per month) will continue. In addition, Dr. Alexander pays private school tuition in full for each child. (N.T. B-34.) He also pays for medical insurance plus 75 percent of expenses not covered by insurance. As part of the divorce

settlement, Ms. Berg received about $100,000 in stocks, a $47,000 retirement fund, an IRA valued at $15,000 and the marital home which has a net equity of nearly $160,000. Dr. Alexander also established a trust fund of $80,000—$40,000 each for the two children. (N.T. B-34-36.) As for other assets, Ms. Berg received an inheritance of $250,000 four years ago which has grown in the interim. She also has a one-fourth interest in approximately 650 acres of land in western Pennsylvania left to her by her mother. (N.T. B-35-37.)

From the foregoing, it is obvious that Ms. Berg is financially well-off. By her own admission, she seeks only to obtain part-time employment paying $15,000 to $30,000 per year. Certainly a woman with Ms. Berg's education would be able to find employment in the Harrisburg area in that salary range. Even if some additional academic training were necessary, we cannot believe that the diversity of college and university offerings in the Harrisburg area would not be adequate to afford Ms. Berg the opportunity to come up to speed. While we would not challenge her opinion that the University of Pittsburgh offers the nearest training in "archival management," it seems to us that the selection of this highly specialized field by Ms. Berg is dictated by a whimsical inclination rather than by necessity. This is not to suggest that Ms. Berg should not be free to indulge any academic pursuit of her choosing after her children are in college. But the test in *Gruber* and its progeny is that the move will "significantly" or "substantially" improve her economic situation. On the testimony presented, we are convinced that the move to Pittsburgh will not improve, or, at best, only insignificantly improve, her economic station.

In contrast, in *Gruber, supra,* mother's living arrangements were about to expire. She had little hope of

becoming self-supporting, and her brother and his wife promised financial support in Illinois. In *Lee, supra,* the move to Washington assured that mother would move from welfare and public housing to a good job and her own home. In *Plowman, supra,* mother moved to Maryland for better opportunities in her chosen profession. In *Vineski, supra,* the move to Tennessee was prompted by a desire to leave a weak local economy for one with more growth opportunity. And most recently in *Gancas, supra,* mother's second husband had a good permanent job in New Jersey.

We find Ms. Berg's quest for self-improvement in a new occupational skill is closely akin to the situation presented in *Clapper v. Clapper,* 396 Pa. Super. 49, 578 A.2d 17 (1990). As the court observed:

"While we cannot fault Mrs. Clapper for wanting to better her life, she may be accomplishing her goals at the expense of the children. The effect of the move would be to uproot Jessica and Jon from familiar and congenial surroundings and to remove them from their father, who up to this time has maintained a steady and frequent relationship with his children." *Id.* at 55, 578 A.2d at 20. (footnote omitted)

Similarly, in *White v. White,* 437 Pa. Super. 446, 650 A.2d 110 (1994), the court noted that mother had not yet secured employment in California and had failed to aggressively pursue employment commensurate with her education in (of all places) the Pittsburgh area. Instantly, Ms. Berg has failed to demonstrate even a modest pursuit of employment commensurate with her education in the Harrisburg area.

We turn now to Ms. Berg's contention that the move will benefit the children by affording them stronger academic and artistic opportunities. (N.T. 189-90.) It is undisputed that both children are academically gifted

and do very well in school. (N.T. A-189, B-17-19.) Both are enrolled in excellent private schools in Harrisburg. Although Ms. Berg does not believe her children were culturally deprived by living in the Harrisburg area, she feels that their horizons could be considerably expanded by living in the Pittsburgh area—drama in Ted's case and creative arts where Rachel is concerned.

Once again we are not persuaded that the proposed move will "substantially" or "significantly" improve the children's educational or cultural development. While the city of Pittsburgh undoubtedly offers a greater variety of cultural and educational resources than does Harrisburg, the capital city area is hardly a cultural wasteland. The private schools which the children attend are first-rate, and the area offers diverse opportunities to stimulate the dramatic or artistic interests of an 11-and 15-year-old. A move to Pittsburgh could only marginally improve the status quo in these areas. Besides, Harrisburg is more centrally located to even greater cultural centers—New York, Philadelphia, Baltimore.

We conclude our analysis on the issue of substantial improvement in the quality of life for the children by reviewing the opinions of the expert witnesses in this case. Dr. Arnold T. Schienvold, the clinical psychologist retained to do a custody evaluation, concluded that Ms. Berg should remain in the role of primary caregiver (N.T. A-8) and that the children should not be separated. (N.T. A-13.) He opined that the "ideal is to have the University of Pittsburgh move to Harrisburg and Martha get the type of program she needs here and then there's not a major change in the routines of the children." (N.T. A-16.) Dr. Shienvold had "no doubt that Ms. Berg's decision to go to Pittsburgh is aimed at promoting her own growth and development." (N.T. A-11.) Putting her interests aside, he was constrained to agree that

the ideal for the children would be for them to stay in their present situation. (N.T. A-16.)

Both Ted and Rachel told Dr. Shienvold that their first preference would be to stay in Harrisburg and keep things just as they are. (N.T. A-18.) Dr. Susan Thornsley, a psychiatrist to whom Rachel was referred for evaluation, opined that Rachel desired the comfort of the same people around her and the same surroundings she was used to. Although Dr. Thornsley believed Rachel would cope with the proposed change, it would not be without difficulty. "She still believes that in an ideal world she would like to stay in Harrisburg, but she's reconciled to the idea of going to Pittsburgh." (N.T. A-160.) Dr. Thornsley also believed that Rachel had a high comfort level with her present therapist. (N.T. A-175.)

Cases since *Gruber,* while acknowledging the refinements developed in that case, remind us that such refinements "do not create a new standard and . . . the polestar of our analysis . . . remains the best interests of child . . . ." *Lee v. Fontine, supra* at 489-90, 594 A.2d at 726.

In every relocation dispute, the court must consider the following interests.

"[T]he custodial parent's desire to exercise autonomy over the basic decisions that will directly affect his or her life and that of the children; a child's strong interest in maintaining and developing a meaningful relationship with the non-custodial parent; the interest of the non-custodial parent in sharing in the love and rearing of his or her children; and, finally, the state's interest in protecting the best interests of the children." *Gancas, supra* at 330-31, 683 A.2d at 1210 (citing *White* and *Gruber*).

When we consider in combination the opinions of the experts, the desires of the children, and the limited educational benefits attending a move to Pittsburgh, we are unable to see the significant or substantial improvements referred to in *Gruber.* The best interests of the children are served by maintaining the status quo.

We turn now to the second prong of *Gruber,* "the integrity of the motives of both the custodial and non-custodial parent in either seeking the move or seeking to prevent it." *Id.* at 185, 583 A.2d at 439. We see no necessity to dwell on this point. Although Dr. Alexander argues that Ms. Berg's planned move is motivated by bitterness surrounding his separation and re-marriage, we do not see this as a central factor in her desire to relocate. As noted heretofore, we are satisfied that she is primarily motivated by her own self-interest. Similarly, we are satisfied that Dr. Alexander's motive in opposing the move is based solely on his desire to retain close contact with his children.

We then turn to the third prong of *Gruber,* "the availability of realistic, substitute visitation arrangements which will adequately foster an ongoing relationship between the child and the non-custodial parent." *Id.*

Presently, Dr. Alexander has his children on alternating weekends from Friday evening to Sunday evening and on each Wednesday overnight. He picks up and transports each child to school every day. It is immediately apparent that a relocation to Pittsburgh would eliminate the daily and Wednesday overnight contacts. It is also quite apparent that the children would be spending seven hours in a car on Father's custodial weekends. (N.T. B-51.) By anyone's standards, spending seven hours on the Pennsylvania Turnpike every other weekend will not be eagerly anticipated by any of the

parties, least of all Ted and Rachel. While half of this time would be spent with Dr. Alexander, it is not likely to be a meaningful substitute for the present arrangement.

We also find it disingenuous of Ms. Berg to suggest that the structure of the children's relationship with their father would not change significantly. (N.T. A-201.) If the children were to become active in extracurricular activities (arts, drama) in Pittsburgh, it's a safe bet that many of these would take place on weekends. Any parent knows that as children reach their teenage years they begin to develop lives of their own. Their sphere of friends and activities necessarily revolves around their school, church and home community.

Even though their parents are divorced, Ted and Rachel presently share the same community with their parents. A move to Pittsburgh not only uproots them from their established order but also requires setting new roots from which they are not likely to want to stray on weekends. They will be left with the unhappy prospect of giving up many weekend activities with their friends; Father, to be a part of such activities, would have to come to Pittsburgh on such weekends.

While all of this is of course possible, the impracticality of it all must be weighed against the benefits to be otherwise gained from the move. "[W]hile the custodial parent has the right to make decisions concerning his or her welfare and the welfare of the minor children, that parent has a responsibility towards the non-custodial parent to maintain the relationship between the minor children and the non-custodial parent." *Plowman, supra* at 152, 597 A.2d at 706. Recognizing that the best interests of a child are closely linked with the interests of a custodial parent, *Gruber* instructs us

to balance this factor against the mutual interest of the child and the non-custodial parent in maintaining as healthy and loving a relationship as possible.

"The task of this court is to sacrifice the non-custodial parent's interest as little as possible in the face of the competing and often compelling interest of a custodial parent who seeks a better life in another geographical location." *Plowman, supra* at 152, 597 A.2d at 706 (quoting *Gruber*).

We recognize that *Gruber* also holds that the "necessity of shifting visitation arrangements to account for geographical distances will not defeat a move *which has been shown to offer real advantages to the custodial parent and the children." Id.* at 185-86, 583 A.2d at 439. (emphasis added) This conclusion, notes Judge Beck, follows *D'Onofrio v. D'Onofrio,* 144 N.J. Super. 200, 365 A.2d 27 (Ch. Div.), where the court held that the advantages of a move should not be sacrificed solely to maintain weekly visitation "where reasonable alternative visitation is available *and where the advantages of the move are substantial." Gruber, supra* at 186, 583 A.2d at 440, quoting *D'Onofrio.* (emphasis added)

In the present case, Ms. Berg's plan for alternative visitation is for longer holidays and longer summer vacations. Dr. Alexander counters with the observation that, while it may be possible to develop a plan with equivalent hours, the loss of daily and weekly contact, coupled with the driving time, eviscerates the continuity of the visitation he now enjoys. We agree with the latter conclusion.

Even were we not to side with Dr. Alexander's challenge to the alternate visitation schedule, we would nevertheless conclude Ms. Berg has failed to demonstrate that any benefits to be gained by the move are "compelling," "substantial" or "significant."

"When a custodial parent seeks to relocate at a geographical distance . . . the custodial parent has the initial burden of showing that the move is likely to significantly improve the quality of life for that parent and the children." *Id.* at 186, 583 A.2d at 440, *accord, Gancas, supra.*

We find instantly that Ms. Berg has not met her initial burden of proof in this case. As noted earlier, her desire to pursue post-graduate training in archival management at the University of Pittsburgh, though perhaps not absolutely whimsical, is certainly not driven by economic necessity. If still of interest when the children graduate from high school in a few years, there would then be time to pursue this field. In the interim, there is certainly opportunity for the part-time employment-which Ms. Berg seeks in the Harrisburg area which would be in keeping with her academic accomplishments. As for the children, any cultural advantages offered by the Pittsburgh area are offset by the trauma of uprooting them from their friends, school and church to which they have now become well accustomed. We defer to the opinions of the experts and the desires of the children in ordering maintenance of the status quo.