722 A.2d 986

TODD PFEIFFER, PLAINTIFF, v. SHARON ILSON, DEFENDANT.

Superior Court of New Jersey
Chancery Division
Family Part
Warren County

Decided August 14, 1998.

*Debra Weisberg*, for plaintiff (*Donahue, Braun, Hagan, Klein, & Newsom*, attorneys).

*Laurie A. Bernstein*, for defendant.

O'CONNOR, J.S.C.

After many months of separation, plaintiff Todd Pfeiffer ("father") filed a Complaint for divorce against defendant Sharon Ilson ("mother"), on March 30, 1998. On April 30, 1998, the parties entered into a Consent Order which, among other things, designated the mother as the primary caretaker of the parties' two children, ages four and eight. On July 28, 1998, the mother filed an Order to Show Cause ("OTSC") why the mother should not be permitted to relocate to California with the children in September 1998. The father filed a cross motion requesting, among other things, that the mother's OTSC be denied and that he be designated the primary caretaker. In the alternative, the father requested that there be a plenary hearing to determine whether it is in the best interests of the children to move to California, and whether the father should become the primary caretaker. The father also asked this court to appoint an expert to conduct an evaluation in connection with these latter two issues. Both parties filed extensive certifications, attached to which were numerous exhibits. Following oral argument this court rendered the following decision.

*N.J.S.A.* 9:2–2 states that a child cannot be relocated outside of our state unless both parents consent or cause is shown. The requisite cause is shown if the primary caretaker has a good faith reason to move, and the move does not interfere with the

best interests of the children or the parenting time of the secondary caretaker. *See Levine v. Bacon,* 152 *N.J.* 436, 705 *A.*2d 1204 (1998).

The following facts were uncontroverted. The mother lives in a rental home in Hackettstown, New Jersey, with the parties' two sons. The mother is a make-up artist who began her career several years ago in Los Angeles, where she worked for various actors and actresses, among whom she continues to have business contacts. She has been having difficulty finding comparable work in the New Jersey/New York area, where the compensation for make-up artists is lower compared to Los Angeles. She had been unemployed from January 1998 to April 1998 when she landed a job in connection with a movie being made in Los Angeles. This position, which paid $3500 per week, ended in August 1998. In July 1998, the mother was offered a permanent position as a make-up artist in Los Angeles, which is to start in September 1998. The mother did not want to accept this position unless the children were permitted to move to California with her; accordingly, she filed the within OTSC.

In the new position, the mother would earn more than $150,000 annually and she would only have to work two days a week. The mother has located suitable housing in Huntington Beach, California, a suburb of Los Angeles, which is only thirty minutes from the studio where she would work. The oldest child just completed his second grade, but such child is advanced beyond his age and is functioning at a fourth grade level. The mother believes this child should be enrolled in a Montessori school or a similar school for gifted children. Neither Hackettstown nor the surrounding community has a gifted child program that would suit this child's needs. There is, however, a Montessori school in Huntington Beach, California. The youngest child has a condition known as "speech delay," and needs intensive speech therapy. The mother found a psychologist in Huntington Beach who is specially trained in early education and speech delay. The children's maternal grandmother, who lives next door to the

children in Hackettstown, is willing to relocate to Huntington Beach and care for the children for the two days each week that the mother is working. In short, if the mother were permitted to relocate to California, she would be able to maximize her income while spending five days a week with the children.

There is no question that the mother has demonstrated a good faith reason to move with the children to California. The court must next consider whether the move will interfere with the best interests of the children or the parenting time of the father. The father maintains that the move will interfere with the best interests of the children, but his reasons are not plausible. The father argues that the children should stay in Hackettstown because the children have "significant" contacts with the surrounding community and the children have lived in Hackettstown all of their lives. The father did not specify what contacts in particular were essential to preserve, other than stating that the children attend school locally and have friends in the area. The children, however, are only four and eight years of age. Given their young ages, it is unlikely the children have developed contacts with the community which, if severed, would be so injurious to their best interests so as to compel their continued residence in Hacketts-town. Certainly, the father did not bring to the court's attention any contacts with the community that had to be maintained. The father also argues that the children should stay in Hackettstown simply because they have been here all of their lives. This court disagrees. If the father's reasoning were accepted, then it would never be in a child's best interest to remove him or her from a particular place if such child had been in the same location since birth.

The father also argues that another benefit to remaining in Hackettstown is that the youngest child's speech problem is improving and the oldest child is doing well in school. This court finds it inconceivable that a city the size of Los Angeles cannot offer comparable, if not better, medical and educational resources. In short, there are not any facts that indicate that the move to Los

Angeles will interfere with the best interests of the children. The final point to consider is the impact the proposed move will have upon the parenting time of the father.

The following facts were also undisputed. The father has been living in Chicago for the last two years, where he has been working as a television producer earning approximately $200,000 a year. In July 1998, he signed another yearly contract with his employer, and on June 1, 1998, he signed a twelve-month lease on an apartment in Chicago; therefore, the father intends to remain in Chicago for at least the foreseeable future. Although the father stated in his certification that he has been flying to New Jersey to see his children every two weeks, he attached a calendar to his certification setting forth the dates he actually traveled to New Jersey to see his children over the last two years. His contact with the children over the last two years has been less than what he claimed in his certification.

In 1997, the father saw the children for two days in January, three days in February, three days in March, two days in April, most of May, all of June and thirteen days in July. The father stated that between May and July of each year he enjoys a "hiatus" from his job, during which he does not have to work; hence, the reason he had increased contact with his children between May and July. In August 1997, the father saw the children for two days. He then saw the children for four days in September, four days in October, a week in November over the Thanksgiving holiday, and ten days in December over the Christmas holiday.

In 1998, the father did not see the children at all in January. He saw the children for two days in February, two days in March and nine days in April. In May 1998, he commenced his summer hiatus, which lasted from May 23, 1998 to July 7, 1998. But for four days, he spent this latter time period in Hackettstown with the children. He then spent an additional six days with the children later in July.

As evidenced by the father's own calendar, he saw the children, on average, only three days per month, unless he was on hiatus from his job between May and July, or visiting with the children over the Thanksgiving and Christmas holidays. Although in one part of his certification he claimed to have seen his children every two weeks over the last two years, an exhibit attached to his own certification (i.e., his calendar) indicated he had visited with the children far less frequently. The point is that, given the father's chosen pattern of visitation since he moved out of New Jersey, he can easily replicate the same amount of visitation in Los Angeles. Although the flight from Chicago to Los Angeles is longer than the flight from Chicago to Newark, given the benefits to the mother and the children if they were to relocate to Los Angeles, the inconvenience is minimal. Furthermore, given the father's income, he can easily afford to fly to Los Angeles.

Moreover, the father's principal parenting time is when he is on hiatus between May and July, and when he spends time with the children over the Thanksgiving and Christmas holidays. During such time periods the father does not need to fly back and forth from Chicago to where the children are living. The father can remain with the children until the hiatus or holiday is over. For that matter, the children can visit with their father in Chicago over the Thanksgiving and Christmas holidays, and during his hiatus from work. As far as visiting with the children at other times of the year, in the past the father has flown to New Jersey once a month for a weekend of visitation. He can continue to do the same if the children moved to California, except that instead of flying to Newark, he can fly to Los Angeles.

In summary, this court found that the mother demonstrated a good faith reason to move, and no fact emerged from the parties' extensive certifications which would indicate that the move would interfere with the best interests of the children. Furthermore, the amount of parenting time the father has chosen to exercise with the children since he moved to Chicago could be maintained if the children went to California. The only inconvenience is that

the father would have to endure a longer flight. There is no question that the father can afford to fly to Los Angeles periodically. The mother is amenable to a flexible and liberal visitation schedule. The father can easily engage in the same level of visitation in Los Angeles as he has enjoyed in New Jersey over the last two years.

Finally, this court has reservations whether *N.J.S.A.* 9:2–2 is even applicable, given the facts in the case at bar, because the secondary caretaker does not even live in or anywhere near the State of New Jersey and has not been living in this state for two years. Research did not disclose a case in which the secondary caretaker lived as far away from the State of New Jersey as does the one in the present case. In the opinions published to date, the secondary caretaker either lived within the state or extremely close to its borders. This court questions whether a primary caretaker is required to secure the consent of the secondary caretaker before moving a child out of our state, or prove that he or she has "cause" under *N.J.S.A.* 9:2–2, when the secondary caretaker does not live in or near to this state.

In *Kridel v. Kridel,* 85 *N.J.Super.* 478, 205 *A.*2d 316 (App.Div. 1964), a child's grandparents had removed the child from New Jersey and had taken him to Florida without asking the permission of the father or the court. (The mother was deceased). The court stated "[w]hat they did was in flagrant violation of our stay order and the law. The policy of our law is generally against taking a child of tender years out of the State where father *continues to reside here* and is a suitable person that should have custody of the child for his best welfare. *See N.J.S.A.* 9:2–4 and 9:2–2." *Id.* at 489, 205 *A.*2d 316. (Emphasis supplied).

In *D'Onofrio v. D'Onofrio,* 144 *N.J.Super.* 200, 365 *A.*2d 27 (Ch.Div.1976), the court stated that the main thrust of the anti-removal provision of *N.J.S.A.* 9:2–2 is to preserve the mutual right of the children and noncustodial parent to develop and maintain a relationship after custody has been awarded to the other parent. *Id.* at 204–05, 365 *A.*2d 27. "[T]he court must be satisfied that

there will be a realistic opportunity for visitation in lieu of the weekly pattern which can provide an adequate basis for preserving and fostering the parental relationship with the noncustodial parent if removal is allowed." *Id.* at 207, 365 *A.*2d 27. Implicit in such language is the assumption that one of the primary purposes behind the removal statute is to protect the visitation rights of the parent who will be left behind in the State of New Jersey.

▮ The father in the present case also argues that this court cannot permit the mother to remove the children without holding a plenary hearing. This court disagrees. On the basis of the uncontroverted facts alone, there is sufficient cause under *N.J.S.A* 9:2–2 to permit the children to move to California. A plenary hearing is not mandatory every time a parent files a motion for permission to remove a child from our state. If there is not a material issue of fact in dispute, then there is not any need to have a plenary hearing. *See Adler v. Adler,* 229 *N.J.Super.* 496, 500, 552 *A.*2d 182 (App.Div.1988).

▮ In his certification the father not only argued against the removal of the children to Los Angeles, but also that he immediately become the primary caretaker. He asserted that the mother was emotionally abusive to the children, had struck one of the children, and used illegal drugs. Although these allegations shall be investigated and can continue to be investigated even if the children go to California, the court was concerned about the sincerity of the father's allegations of unfitness, for the following reasons.

First of all, the father had never before asserted that the mother was unfit. In fact, in his Complaint for divorce the husband sought joint physical custody. Thereafter, in April 1998, the mother filed a domestic violence Complaint against the father. She dismissed the domestic violence complaint later in the month, but only after the father agreed to sign a Consent Order which contained the same restraints as set forth in the domestic violence temporary restraining Order. Significantly, included in the Consent Order was a provision that the father agreed to refrain from

threatening, following and stalking the children. The implication is that the father would not have agreed to such a provision unless he were concerned that the allegations in the domestic violence Complaint were going to be proved. The Consent Order clearly indicates that the focus of concern was the father's behavior vis-a-vis the children, and not the mother's behavior toward the children. Had the mother's behavior toward the children been a concern to the father, it is inferable that such concern would have been raised and addressed, at least to some degree, at the time the Consent Order was signed. The Consent Order, however, is devoid of any language that would suggest that the father was in any way concerned about the mother's treatment of the children.

In addition, in the Consent Order the parties not only agreed to having joint legal custody, but also that the mother be the primary caretaker. It is unlikely the father would have agreed to the mother being the primary caretaker if he truly believed that she were unfit. Moreover, if the father were concerned about the mother's care of the children, then it is not logical that he would have relocated to Chicago two years ago and have left the children in her care.

In his certification the father also alleged that the mother used illegal drugs. The mother filed a certification in reply denying the use of such drugs, and attached to her certification the results of a drug test she took the very day she received the father's certification. The test results do not indicate the presence of any illicit drugs.

Although the father professed to having contact with his children as frequently as every two weeks, as elaborated upon above, an exhibit attached to his own certification belied the frequency with which he claimed to have visited the children. In addition, the father asserted he was "extremely involved" with the children's education. Yet attached to his certification was a copy of a letter he had written to one of the children's teachers at the end of this past school year. This letter, dated May 24, 1998, stated "[y]es I do exist and am home with [my children] now." A

reasonable conclusion to be drawn from such statement is that the father knew he had not been in communication with the child's teacher and was acknowledging such lack of contact in the letter. In short, the father's letter cast doubt upon his claim that he was an "extremely participatory parent" with respect to the children's education.

Although the father states that he should become the primary caretaker immediately, he is also insisting that the children remain in Hackettstown. Yet in July 1998, the father renewed his yearly employment contract in Chicago. In June 1998, he entered into a year long lease for an apartment in Chicago, paying rent in the amount of $2000 per month. If the father wanted the children to remain in Hackettstown and also wished to become the primary caretaker, the steps he took just one month before the mother filed the within OTSC were clearly inconsistent. Just weeks before the mother filed her application to remove the children to California, the father was apparently content with the mother being the primary caretaker.

In conclusion, there are not any credible facts to indicate that it would be in the children's best interests for the father to become the primary caretaker at this time. As for scheduling a plenary hearing on whether the father should be the primary caretaker, such issue will be dealt with at the time of the final divorce hearing, unless facts emerge that warrant holding a plenary hearing sooner, *pendente lite*. For the present, this court does not detect any reason why it should disturb the current caretaking arrangement which has existed since the father moved to Chicago two years ago.

■ Finally, this court denied the father's request that the court appoint an expert from New Jersey to conduct a custody evaluation. Inasmuch as the children can go to California, it is more reasonable to give the parties an opportunity to select an expert or experts from California, who will have the capacity to interview the children and the mother, and investigate the children's environment in California, rather than have the court

appoint an expert from New Jersey. If the court appointed an expert from New Jersey, the children and the parties would have to fly back to New Jersey to be evaluated. Moreover, evaluations are not always concluded in one session, necessitating more than one trip to New Jersey. It is far more practical to give the parties a chance to select their own expert and if they are incapable of doing so, then the court can appoint one. Therefore, the husband's request that the court appoint an expert at this time is denied, although without prejudice.