517 S.E.2d 220

**Paul Ray RICE, Respondent,**

v.

**Carleen K. RICE, Appellant.**

**No. 2977.**

Court of Appeals of South Carolina.

Heard Jan. 13, 1999.

Decided April 26, 1999.

R. Wayne Byrd, of Turner, Padget, Graham & Laney, of Florence, for appellant.

Thomas D. Guest, of Law Offices of N. David DuRant, of Surfside Beach, for respondent.

HOWELL, Chief Judge:

Carleen Rice (the Mother) appeals from a family court order awarding her custody of the parties' children, but requiring her to return from Maine and live in South Carolina or within 250 miles of Conway, South Carolina, where Paul Rice (the Father) resides. We reverse in part and remand.

I.

The parties married in July 1990 and resided in Conway, South Carolina. They had three children, born in 1991, 1993, and 1995.

The parties separated for a short period of time in 1994, after the Father admitted to having an affair with Debra Jennings, a co-worker. They later reconciled. After the reconciliation, Jennings began harassing the Mother and Father, calling the house and hanging up, frequently driving by their house, and even appearing at the hospital after the Mother gave birth to the parties' third child in April 1995. The parties' home was broken into in June 1995, and pictures of the Mother were later discovered to be missing. The Mother saw Jennings near the home just before discovering the burglary and filed a police report naming Jennings as the perpetrator.

In July 1995 the parties separated again, and the Mother and the children moved to Greenville. Several months later the parties again reconciled, and the Father moved to Greenville. The parties' problems, including the harassment by Jennings, continued during the reconciliation. The parties separated a final time in February 1996.

Throughout the parties' many separations and reconciliations, the Father represented to the Mother that he was no longer involved with Jennings. However, the parties found notes, one addressed to "Paul" and signed by "Debbie," on the door of the Conway home in December 1995. In the notes, Jennings expressed, among other things, her disappointment that the Father had chosen the Mother over her. The notes indicated that the Father and Jennings had been involved for eighteen months.

Several months after the commencement of this action, but before any temporary relief had been requested by either party, the Mother and the children moved to Maine. Two of the Mother's brothers and her sister live within twenty miles of the Mother's home in Maine.

At trial, the guardian ad litem testified that the Mother was the primary caretaker of the children, and the guardian believed that the Mother should be granted custody. The guardian, however, noted that neither party had the financial resources to allow frequent travel back and forth between Maine and South Carolina. Thus, the guardian was concerned that the Father would not have adequate visitation with the children if the Mother remained in Maine. The guardian hoped that the Mother would voluntarily move back to Newberry, South Carolina, where her parents lived. If the Mother did not move, the guardian recommended that she bear the transportation costs associated with visitation.

The family court granted custody of the children to the Mother. However, the court determined that the Mother's move to Maine jeopardized the children's relationship with the Father, and that the best interest of the children would be served by requiring the Mother to return from Maine. The family court therefore ordered the Mother to return to South Carolina or to any other location within 250 miles of Conway as long as the Father resided there.

The Mother filed a motion to reconsider, requesting that the family court lift the requirement that she move from Maine. The court denied the motion, noting at the hearing that if the Mother did not move, "I guess we've got something that's

going to amount to basically, switching the custody action again." [1]

## II.

The sole issue on appeal is whether the family court properly required the Mother to return to South Carolina or to within 250 miles of Conway; there is no challenge to the court's decision to award custody to the Mother. When resolving this issue, of course, this Court has jurisdiction to find facts in accordance with our view of the preponderance of the evidence. *Epperly v. Epperly,* 312 S.C. 411, 414, 440 S.E.2d 884, 885 (1994).

Cases involving the relocation of a custodial parent "present some of the knottiest and most disturbing problems that our courts are called upon to resolve." *Tropea v. Tropea,* 87 N.Y.2d 727, 642 N.Y.S.2d 575, 578, 665 N.E.2d 145, 148 (1996). In some states, there is a presumption, either statutorily- or judicially-mandated, in favor of the custodial parent's right to move. *See, e.g., In re Custody of D.M.G. & T.J.G.,* 287 Mont. 120, 951 P.2d 1377, 1383 (1998) (Because an order prohibiting a custodial parent from relocating interferes with the custodial parent's constitutional right to travel, " 'we require the parent requesting the travel restriction to provide sufficient proof that a restriction is, in fact, in the best interests of the child.' "); *In re Marriage of Burgess,* 13 Cal.4th 25, 51 Cal. Rptr.2d 444, 913 P.2d 473, 478 (1996) (California statute creates a "presumptive right of a custodial parent to change the residence of the minor children, so long as the removal would not be prejudicial to their rights or welfare.").

In South Carolina, however, there is a presumption in child custody cases *against* removing children from the state. *See McAlister v. Patterson,* 278 S.C. 481, 483, 299 S.E.2d 322, 323 (1982); *VanName v. VanName,* 308 S.C. 516, 419 S.E.2d 373 (Ct.App.1992), *cert. denied* (January 6, 1993). Nonetheless, because "[f]orcing a person to live in a particular area encroaches upon the liberty of an individual to live in the place of his or her choice," the court's authority to prohibit an

---

1. No similar statement was included in the written order denying the Mother's motion to reconsider.

out-of-state move "should be exercised sparingly." *VanName,* 308 S.C. at 519, 419 S.E.2d at 374. The presumption may be rebutted by a showing that the move will benefit the child. *See McAlister,* 278 S.C. at 483, 299 S.E.2d at 323 ("In situations where removal will benefit the child, removal has been allowed."). Thus, the question of whether relocation will be allowed requires a determination of whether the relocation is in the best interest of the children, the primary consideration in all child custody cases. *See Pitt v. Olds,* 333 S.C. 478, 481–82, 511 S.E.2d 60, 62 (1999) (reversing opinion of this Court that permitted mother to move with child to Arizona because, in part, "there are no findings by the Court of Appeals that a move to Arizona would be in [the child's] best interest. In sharp contrast is the order of the family court which specifically finds the move would not be in [the child's] best interest."); *McAlister,* 278 S.C. at 483–84, 299 S.E.2d at 323 (affirming decision of trial court to deny request to move where trial court determined that child's best interest would be served by remaining in South Carolina); *Eckstein v. Eckstein,* 306 S.C. 167, 169, 410 S.E.2d 578, 580 (Ct.App.1991) (reversing requirement that custodial parent return to 250–mile radius of Spartanburg, noting that "such a requirement is, at best, premature, in that no facts were developed to show it was in the best interest of the children").

This case, however, is somewhat different from the typical relocation case. Most relocation cases involve a proposed move by the custodial parent sometime after the order vesting custody in the parent seeking to move. Here, when the Mother and the children moved to Maine, she had physical custody of the children pursuant to an agreement between the parties. After the Father learned of the move, he did not seek a temporary order prohibiting or otherwise restricting the move. Thus, at the time of the move, there was in place no order, temporary or final, vesting custody of the children in the Mother. The family court, therefore, was not truly called upon to decide whether the Mother, as custodial parent, should be allowed to move the children to Maine. Instead, the court was called upon to decide whether to grant custody in the first instance to the Mother, who lived in Maine, or to the Father, who lived in South Carolina.

The Mother does not argue on appeal that, because there was no order in place when she moved to Maine and because the Father never sought a court order prohibiting the move, the family court lacked the authority to order her to move. Therefore, we will assume, for the purposes of this opinion, that the family court had the authority to order the Wife to move from Maine. *But see In re Marriage of Littlefield,* 133 Wash.2d 39, 940 P.2d 1362, 1371 (1997) (en banc) (in case where mother and child moved out-of-state after dissolution action was commenced but before the issuance of any temporary or final orders, court concluded that trial court erred by including as part of its custody determination a requirement that the mother return to Washington with the child: "The trial court does not have the responsibility or the authority or the ability to create ideal circumstances for the family. Instead, it must make parenting plan decisions which are based on the actual circumstances of the parents and of the children as they exist at the time of trial."). Thus, the question we must resolve is whether the requirement that the Mother move from Maine is in the best interest of the children. *See Cook v. Cobb,* 271 S.C. 136, 140, 245 S.E.2d 612, 614 (1978) (The welfare and best interest of the child "is the primary, paramount and controlling consideration of the court in all child custody controversies.").

Putting aside for the moment the issue of the move to Maine, we first note that, based on our own review of the record, the family court properly awarded custody of the children to the Mother. The evidence in the record clearly establishes that the Mother has been the primary caretaker of the children during their young lives and that she is more than fit to have custody of the children. The Father's relationship with Debra Jennings, however, causes us to question his fitness to be the custodial parent.[2] Thus, if the Mother had

---

**2.** There is compelling evidence in the record that the Father exposed the children to his improper relationship with Jennings. According to Annette Trottier, a friend of the Mother, one of the children initiated a conversation with her about Jennings, whom the child called "Fruitcake." The child told Trottier that he "saw Daddy kissing Fruitcake" in a shed behind the marital home. The child also told Trottier that he knocked on the door of the shed and when the Father "open[ed] the door, his pants fell down." Two days after her conversation with the

remained in South Carolina, we would have no hesitation in concluding that the best interest of the children requires awarding custody to the Mother rather than the Father. *See, e.g., Gandy v. Gandy,* 297 S.C. 411, 414, 377 S.E.2d 312, 313–14 (1989) ("In custody decisions, the best interest of the child is the paramount consideration. Custody is based on a determination of the character, fitness, attitude and inclinations on the part of each parent.") (citations omitted). The question then becomes the extent to which the Mother's move to Maine impacts on this conclusion.

Although this case is not a true relocation case, we believe that cases involving the relocation of custodial parents will be helpful in determining whether the best interest of the children will be served by requiring the Mother and the children to move from Maine. After all, one of the primary concerns in most true relocation cases—the need to maintain a relationship with the non-custodial parent—is also of great importance in this case.

Unfortunately, South Carolina case law provides little guidance as to how a court should determine whether an out-of-state move is in the best interest of the children. As noted by this Court in *Pitt v. Olds,* 327 S.C. 512, 519, 489 S.E.2d 666, 670 (Ct.App.1997), *reversed on other grounds,* 333 S.C. 478, 511 S.E.2d 60 (1999), other states have set forth criteria to be used when evaluating the propriety of a proposed move. For example, the New York Court of Appeal has concluded that:

[I]n all [relocation] cases, the courts should be free to consider and give appropriate weight to all of the factors that may be relevant to the determination [of the best interest of the child]. These factors include, but are certainly not limited to each parent's reasons for seeking or opposing the move, the quality of the relationships between the child and the custodial and noncustodial parents, the impact of the move on the quantity and quality of the child's future contact with the noncustodial parent, the degree to which the custodial parent's and child's life may be enhanced economically, emotionally, and educationally by the move, and the feasibility of preserving the relationship

child, Trottier wrote down the conversation and sent it to church elders.

between the noncustodial parent and child through suitable visitation arrangements. In the end, it is for the court to determine, based on all of the proof, whether it has been established by a preponderance of the evidence that a proposed relocation would serve the child's best interests. *Tropea*, 642 N.Y.S.2d at 581–82, 665 N.E.2d at 151–52. Similarly, Pennsylvania requires courts in relocation cases to consider the potential advantages of the proposed move, economic or otherwise; the likelihood the move would improve substantially the quality of life for the custodial parent and the children and is not the result of a whim on the part of the custodial parent; the integrity of the motives of both the custodial and noncustodial parent in seeking the move or seeking to prevent it; and the availability of realistic substitute visitation arrangements that will adequately foster an ongoing relationship between the child and the noncustodial parent. *Gancas v. Schultz*, 453 Pa.Super. 324, 683 A.2d 1207, 1210 (1996); *see also Carter v. Schilb*, 877 S.W.2d 665, 667–68 (Mo.Ct.App.1994) (When considering the propriety of allowing a custodial parent to remove a child from the state, the courts should consider "whether the prospective advantages of the move will improve the general quality of life for the parent and the child"; "the integrity of the custodial parent's motives in moving"; "the integrity of the noncustodial parent's motives for opposing the relocation, and the extent to which it is intended to secure a financial advantage with respect to continuing child support"; and "the realistic opportunity for visitation which can provide an adequate basis for preserving and fostering the noncustodial parent's relationship with the child if relocation is permitted."); *Holder v. Polanski*, 111 N.J. 344, 544 A.2d 852, 856–57 (1988) (if custodial parent has a good-faith reason for an out-of-state move that will cause substantial changes in the visitation schedule of the noncustodial parent, the court must consider the "prospective advantages of the move, the integrity of the motives of the party, and the development of a reasonable visitation schedule.... In resolving the tension between a custodial parent's right to move and a noncustodial parent's visitation rights, the beacon remains the best interests of the children."); *cf.* Florida Statutes § 61.13(2)(d) (1997) ("In making a determination as to whether the primary residential parent

may relocate with a child, the court must consider the following factors: (1) Whether the move would be likely to improve the general quality of life for both the residential parent and the child. (2) The extent to which visitation rights have been allowed and exercised. (3) Whether the primary residential parent, once out of the jurisdiction, will be likely to comply with any substitute visitation arrangements. (4) Whether the substitute visitation will be adequate to foster a continuing meaningful relationship between the child and the secondary residential parent. (5) Whether the cost of transportation is financially affordable by one or both parties. (6) Whether the move is in the best interests of the child.").

Certainly, the factors set forth in these cases cannot be viewed as binding on this Court. Nonetheless, a determination of the best interest of the children is an inherently case-specific and fact-specific inquiry. *See Wheeler v. Gill,* 307 S.C. 94, 99, 413 S.E.2d 860, 863 (Ct.App.1992) (In child custody cases, " 'the totality of the circumstances peculiar to each case constitutes the only scale upon which the ultimate decision can be weighed.' "). We find the factors articulated above provide a useful means of focusing our inquiry into the best interest of the children, particularly in light of the unique factual circumstances of this case. Accordingly, we now turn to the facts to determine whether the best interest of the children require the Mother to return with the children from Maine.

Because the Mother was primarily responsible for raising the children, she worked only sporadically during the marriage, mostly at minimum-wage positions. The Mother is a high school graduate, but, at the time of the separation, she had no specialized training or experience. Thus, at the time of the separation, the Mother's ability to provide for herself and the children was rather limited.[3]

---

**3.** The Father's financial picture is not substantially brighter than the Mother's. At the time of the hearing, the Father earned from his full-time job a gross income of approximately $1,900 per month, which includes frequent overtime ranging from three to eighteen hours per week. The Father also earned an additional $300 a month from a part-time job he took to pay legal expenses. After considering the Father's income and imputing a minimum wage income to the Mother, the family court determined the Father's child support obligation to be

After the separation, the Mother began looking into the possibility of becoming a cosmetologist as a means of supporting herself and her children. The Mother quickly learned, however, that she did not have the financial resources to reach this goal if she stayed in South Carolina. After exhausting available grants and other financial aid, the five-days-a-week, eighteen-month training program would cost the Mother approximately $2,000, which she could not afford. The only time the Mother would be able to work would be nights or weekends, and she was unable to find adequate and affordable childcare for her three children for the time she would be in school and at work.

However, the Mother learned it was feasible for her to become licensed as a cosmetologist in Maine. Although the program in Maine also lasts eighteen months, the state would cover all the Mother's costs associated with the program. In Maine, the Mother can become licensed by apprenticing with a cosmetologist two or three days a week, during which time the Mother would be paid. Although she had not begun the training at the time of the hearing, the Mother had been offered an apprenticeship at a salon.

The Mother's brothers and sister live nearby in Maine and are available to help care for the children, and the state of Maine also offers child care services to the Mother at no cost to her. Finally, because of various subsidies available to the Mother in Maine, she and the three children live in a four-bedroom apartment. When the Mother lived in Greenville after the separation, she and the children lived in a two-bedroom apartment.

After considering all the relevant evidence, it is apparent to this Court that the quality of life of the Mother and the children in Maine is substantially better than it would be were they required to live in South Carolina. If the Mother were required to return to South Carolina, she would most likely be relegated to a minimum-wage job and would again be present-

---

approximately $750 per month. With this Court's permission, the Mother filed a motion with the family court contending that the court made a mathematical error when calculating the Father's child support obligation. According to the Mother, the child support should be almost $800 per month. There is no indication in the record that the family court has acted on the Mother's motion.

ed with the problem of finding affordable child care. But in Maine, the Mother has close family nearby to help her care for the children, as well as state-funded child care. More importantly, by living in Maine, the Mother will be able to learn a trade that should provide a level of financial security that she likely would not be able to reach in South Carolina, and that will allow her to properly care and provide for herself and her children.

As to the motives of the Mother, we find no evidence in the record supporting a conclusion that the Mother moved to Maine to frustrate the Father's visitation rights.[4] While the effect of the move in fact is to make visitation much more difficult, it is improper to assume a bad motive simply because the decision may have an unpleasant result. Given that the Mother has close relatives who live in Maine, it is completely logical for her to have sought out information about the possibility of becoming a cosmetologist in Maine once she concluded it was not feasible in South Carolina. Thus, we conclude that the Mother's move to Maine was a good-faith attempt to improve the lives of herself and her children, not a vindictive attempt to destroy the Father's relationship with the children. Likewise, we find no evidence in the record to indicate that the Father opposes the move for any reason other than his good-faith desire to maintain a relationship with his children. Accordingly, because neither party's actions are motivated by an improper purpose, this factor is of little importance to a determination of the children's best interest.

After carefully reviewing the record, we are convinced that the quality of life for the children will be vastly improved in Maine, which strongly suggests that the best interest of the children would be served by allowing them to remain with the Mother in Maine. *See D'Onofrio v. D'Onofrio,* 144 N.J.Super. 200, 365 A.2d 27, 33 (1976) (allowing mother with custody of

---

4. We note that some commentators question the propriety of considering the motives behind a proposed move. *See Legal and Mental Health Perspectives on Child Custody Law: A Deskbook for Judges* § 21:5 (West 1998) ("It is too easy for any observer to be mistaken about motives, mixed as most emotions and intentions are with proper reasons for behavior. Bad motives can easily be attributed to a person making a decision with which one disagrees, and seeking purposes underlying behavior permits factfinders innocently but more easily to allow their own values to influence their relocation decisions.").

children to move from New Jersey to South Carolina, where mother had family in South Carolina and the financial circumstances and standard of living of mother and children would be substantially improved in South Carolina: "[V]isitation [for the father after the move] being practical and realistic, this court could not in good conscience, and simply because weekly visitation may be more convenient for the father, require this mother and her children to endure indefinitely their separation from family, their present subsistence level and their continuing financial struggle when happier prospects are already within their grasp."), *aff'd,* 144 N.J.Super. 352, 365 A.2d 716 (1976), *modified in part by Holder v. Polanski,* 111 N.J. 344, 544 A.2d 852 (1988); *cf. VanName,* 308 S.C. at 518–19, 419 S.E.2d at 374 (affirming decision to allow mother to move with children from South Carolina to Virginia, where she had family and better career prospects). Nonetheless, we must factor into this equation the impact of the move on the children's relationship with their Father.

Certainly, the relationship between a noncustodial parent and his or her children is vitally important and worthy of fostering and protecting. It must be recognized, however, that in all divorces, the parents' relationships with their children, and particularly the relationships between non-custodial parents and their children, are changed substantially and permanently, whether the parents and children live in the same state or even the same town. Thus, the difficulty in maintaining the relationship between the noncustodial parent and the children is as much a function of the divorce itself as it is of the distance between the households. *See In re Marriage of Littlefield,* 940 P.2d at 1371 ("[T]he practical result of a marriage dissolution is that parenting and family life will not be the same after dissolution. This is so even though a trial court may believe it is in the 'best interests of the child' to continue to live in the same family unit. A child cannot escape the reality that his or her family unit is no longer the same."); *Tropea,* 642 N.Y.S.2d at 581, 665 N.E.2d at 151 ("Like Humpty Dumpty, a family, once broken by divorce, cannot be put back together in precisely the same way. The relationship between the parents and the children is necessarily different after a divorce, and, accordingly, it may be unrealistic in some cases to try to preserve the noncustodial parent's accustomed

close involvement in the children's everyday life at the expense of the custodial parent's efforts to start a new life or to form a new family unit."); *D'Onofrio*, 365 A.2d at 29 ("Even under the best of circumstances and where the custodial parent is supportive of a continuing relationship between the child and the noncustodial parent, the nature of a parental relationship sustainable by way of visitation is necessarily and inevitably of a different character than that which is possible where the parents and children reside together as a single-family unit.").

In this case, the family court focused nearly exclusively on the relationship between the children and the Father when it required the Mother to move from Maine. The court noted almost in passing the reasons the Mother believed supported her move to Maine, but the court's order did not even acknowledge the possibility that the circumstances in Maine might serve to benefit the children. Instead, the court concluded that the Father's relationship with the children would be jeopardized by the move to Maine, and that the best interest of the children therefore required the Mother return to South Carolina or any other location within 250 miles of Conway. By focusing so strongly on the relationship between the Father and the children, the family court ignored the reality that the relationship has already been irrevocably changed by the divorce. More importantly, by placing such emphasis on that single issue, the court effectively ignored the countless other factors that impact substantially on the best interest of the children.[5] While the Father's relationship with the children is extremely important, it is but one of the factors that goes into the sometimes nebulous best-interest determination.

---

5. The family court's comment at the hearing on the Mother's motion to reconsider that the Mother's failure to move would likely lead to a change in custody further demonstrates that the court was not properly focusing on the best interest of the children as determined by the totality of the circumstances. Although the court had properly concluded that the Mother was more fit than the Father to be the custodial parent, the court was apparently willing to disregard this conclusion if the Mother did not move. Certainly, the fitness of the Mother to be the custodial parent is in no way dependent on the state in which she lives, nor can the Father's fitness somehow be enhanced by the fact that he lives in South Carolina.

If there were any evidence in the record that the Mother and the children could lead the same quality of life in South Carolina as they can in Maine, a determination that the best interest of the children would be served by living in close proximity to the Father might well have been proper. However, the only evidence in the record establishes, as discussed above, that the future is much more promising for the Mother and the children in Maine than it is in South Carolina. The family court's order failed to recognize these benefits and essentially turned proximity to the noncustodial parent into the determinative factor in the best-interest analysis. Instead, the family court should have balanced the harm to the children's relationship with the Father and the difficulty he will have in exercising visitation if the children live in Maine against the benefits that the children will receive from living in Maine.

Although the sheer distance between Maine and South Carolina means that physical visitation would be limited, we believe that increased use of alternatives to normal physical visitation, such as phone calls, letters, and even e-mail, can lessen the impact of the decreased visitations. *See McGuinness v. McGuinness*, 114 Nev. 1431, 970 P.2d 1074, 1077–78 (1998) ("Physical separation does not preclude each parent from maintaining significant and substantial involvement in a child's life, which is clearly desirable. There are alternate methods of maintaining a meaningful relationship, including telephone calls, e-mail messages, letters, and frequent visitation. Also, the well-being of a parent, which could be heightened by relocation, may have a substantial effect on the best interest of the child."). We also note that the family court awarded the Father weekend visitation only once a month. Putting financial considerations aside for the moment, a somewhat similar visitation schedule is certainly feasible even with the Father in South Carolina and the children in Maine. Moreover, extended periods of visitation during vacations and over the summer should offer the Father ample opportunity to develop and maintain a meaningful relationship with the children. *See Tropea*, 642 N.Y.S.2d at 580, 665 N.E.2d at 150 ("[T]here are undoubtedly also many cases where less frequent but more extended visits over summers and school vacations would be equally conducive, or perhaps even more

conducive, to the maintenance of a close parent-child relationship, since such extended visits give the parties the opportunity to interact in a normalized domestic setting."). Finally, given that, during the pendency of this action, the Father never sought to prevent the Mother from moving to Maine with the children, it appears that even the Father believed he could maintain an adequate relationship with the children despite the distance.

We therefore conclude that visitation arrangements, albeit non-traditional, can be made that will preserve the relationship between the Father and the children, even with the children living with the Mother in Maine. While the parties have relatively limited financial resources, we believe these arrangements are feasible.

As noted above, the Father earned a gross income of approximately $1,900 per month at the time of the hearing. After imputing a minimum-wage income to the Mother and considering day care expenses of $580 per month, the family court determined that the Father's child support obligation was approximately $750 per month. The child support calculations were based on the family court's assumptions of the financial circumstances upon the Mother's return to South Carolina. The financial picture, however, should be significantly different with the Mother living in Maine. First, once the Mother becomes a cosmetologist, she will be able to earn much more than minimum wage. Second, the record establishes that there will be no daycare expenses in Maine. These two changes alone should result in a substantially lower child support obligation on the part of the Father, thus making more income available to him to pay for the inevitably costly visitation. Similarly, the Mother's increased earnings will make it possible for her to contribute to the costs of visitation. Finally, at the hearing on her motion to reconsider, the Mother volunteered to reduce the Father's child support obligations to make the visitation more financially feasible. Given these circumstances, we are convinced that an adequate, affordable visitation schedule can be established with the children in Maine.

Based on our review of the record, we are also convinced that the Mother will do everything in her power to foster the

Father's relationship with the children and to facilitate the visitation.[6] Under these circumstances, we trust that a realistic visitation schedule can be crafted that will allow the Father to maintain his relationship with the children in spite of the distance.

Therefore, after considering all the circumstances in this case and after balancing the harm to the children's relationship with the Father against the benefits they will receive by living in Maine, we conclude that the Mother established that

---

6. We are well aware of two instances when the Father claims he drove to Delaware to pick up the children for visitation but the Mother failed to appear. The Mother, however, testified that these instances occurred before she received a copy of the temporary order granting her custody of the children and setting out visitation for the Father. The Mother also testified that she notified the Father on one occasion that she would not be meeting him in Delaware, and attempted to notify him the second occasion, but that his sister refused to give him a message. The Mother then called a church elder who had been counseling the parties and told him that she would not be meeting the Father in Delaware. Given the Father's previous threats to take the children and prevent the Mother from seeing them again, we understand the Mother's reluctance to turn over the children before she received the order granting her custody. More importantly, however, we simply find the Mother's testimony about notifying the Father to be more credible than the Father's testimony.

While we generally are hesitant to make credibility determinations based on a cold record, there are many instances during the Father's testimony where it is apparent to this Court that he simply was not being truthful. For example, notwithstanding the notes found at the marital home and the behavior of Debra Jennings, the Father insisted at the hearing that he committed adultery with Jennings on only one occasion. The Father contended that this single act of infidelity took place at a friend's house, yet he claimed he could not remember the name of the friend. In addition, the Father's description of an incident in Greenville where the Mother had the police remove him from her apartment while the children "were crying in [his] arms" was completely contradicted by an elder in the parties' church who had been involved in counseling the parties in an effort to save the marriage. According to this witness, who was clearly uncomfortable with being required to testify, the children were asleep until the Father woke them up after the Mother asked him to leave. The witness testified that the Father had "captivated these children and was using them as a shield when the police were there to keep them from taking him out of that house." The Father's obvious lack of candor with the family court causes us to doubt his claims that the Mother failed to inform him that she would not meet him in Delaware. We also note that there is no evidence in the record that any problems with visitation have occurred since the Mother received the temporary order.

the best interest of the children will be served by allowing them to live with her in Maine, thus rebutting any presumption that she and the children should live in South Carolina. We fully recognize that it will be more difficult to maintain the Father's relationship with the children than it would be if the children lived in South Carolina. Nonetheless, given our conclusion that a realistic and financially feasible visitation plan can be established, the improvements to the children's quality of life that they will attain in Maine compel the conclusion that their best interest will be served by allowing them to remain with their Mother in Maine.[7]

Accordingly, for the foregoing reasons, we hereby reverse that portion of the family court's order requiring the Mother to return to South Carolina or to any other location within 250 miles of Conway, South Carolina, and we remand for the establishment of an appropriate visitation schedule for the Father in accordance with the guidelines set forth in this opinion. Should the family court determine it to be proper, the court may adjust the Father's child support obligation to help offset the inevitably higher costs of exercising visitation.

**REVERSED IN PART AND REMANDED.**

STILWELL and HOWARD, JJ., concur.

---

7. The Mother remarried sometime before the hearing on her motion to reconsider. Because the remarriage was not considered by the family court in reaching its initial custody decision, we likewise do not consider it in reaching our decision.